[Cite as *In re I.H.*, 2017-Ohio-815.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: | : | |
| [I.H. et al., | : | No. 16AP-463 |
| | | (C.P.C. No. 05JU-17209) |
| D.H., | : | |
| | | (REGULAR CALENDAR) |
| Appellant]. | : | |
| In re: | : | No. 16AP-467 |
| | | (C.P.C. No. 13JU-14763) |
| [R.J., | : | |
| | | (REGULAR CALENDAR) |
| D.H., | : | |
| Appellant]. | : | |

———————

D E C I S I O N

Rendered on March 7, 2017

———————

**On brief:** *William T. Cramer*, for appellant.

**On brief:** *Robert J. McClaren*, for appellee Franklin County
Children Services.

———————

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

BROWN, J.

{¶ 1} D.H. ("father"), appellant, appeals a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, in which the court granted the motion of Franklin County Children Services ("FCCS"), appellee, for permanent custody with regard to appellant's two children, I.H. and R.J.

{¶ 2}   Father and the children's mother, D.J. ("mother") have 12 children, although paternity has never been legally established between father and any of the children. At the time of the hearing, the six eldest children had aged out of foster care. Two children were placed into a permanent planned living arrangement. The four youngest children include two sons ("the sons"): Da.H., who was 15 years old at the time of the proceedings, and De.H., who was 13 years old at the time of the proceedings; and two daughters ("the daughters"): I.H., who was 12 years old at the time of the proceedings, and R.J., who was 9 years old at the time of the proceedings.  The current matter involved the four youngest children, but the present appeal relates only to the two daughters, I.H. and R.J., given the trial court's decision to return the sons to appellant's custody.

{¶ 3}   Da.H. De.H., and I.H. entered foster care in December 2003. The children were found dependent and a temporary court commitment was granted to FCCS in March 2006. The children were returned to father's care in December 2006, and custody was awarded to father in August 2008. In late 2013, concerns arose regarding school attendance, lack of utilities, lack of food, poor hygiene, lack of supervision, father's drug use, and drug activity in the home. In October 2013, a complaint was filed with respect to R.J.

{¶ 4}   FCCS subsequently received temporary court commitment with regard to all four children in January 2014. A case plan for both parents was approved and adopted. The sons were placed in foster care together but were later placed into separate homes, while the daughters were placed in foster care together.

{¶ 5}   On July 15, 2015, FCCS filed motions for permanent custody with regard to the four children. A trial on the motions commenced in February 2016. Mother did not appear at the trial, but father appeared. On May 18, 2016, the trial court entered a judgment, ordering the sons be placed in father's custody, but granting permanent custody of the daughters to FCCS.

{¶ 6}   Father appeals the judgment of the trial court, asserting the following assignment of error:

> The trial court's determination that appellant's parental rights should be terminated in regard to his youngest children is not supported by clear and convincing evidence.

{¶ 7}    Father argues in his assignment of error that the trial court's decision, with regard to the daughters, was not supported by clear and convincing evidence. R.C. 2151.414 governs the procedure for granting permanent custody of a child to an agency such as FCCS.  Under R.C. 2151.414(B)(1), a trial court may grant permanent custody to an agency if the court determines by clear and convincing evidence that: (1) it is in the best interest of the child, and (2) one of the situations set forth in R.C. 2151.414(B)(1)(a) through (d) applies. Clear and convincing evidence is that measure or degree of proof which is more than a mere preponderance of the evidence, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases, and that will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42, citing *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 8}    In determining whether the trial court's ruling on the permanent custody motion is against the manifest weight of the evidence, we must consider whether the evidence on each element of the agency's case satisfied or failed to satisfy the burden of persuasion, i.e., whether clear and convincing evidence supports each element. *See Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 11, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 19.  A judgment supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *Id.* at ¶ 10, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. " 'The phrase "some competent, credible evidence" * * * presupposes evidentiary weighing by an appellate court to determine whether the evidence *is* competent and credible.' " (Emphasis sic.) *Id.*, quoting *Eastley* at ¶ 15.

{¶ 9}    "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief.' " (Emphasis omitted.) *Eastley* at ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "Thus, in reviewing a judgment under the manifest-weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and

determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way." *Sparre* at ¶ 10, citing *Eastley* at ¶ 20.

{¶ 10} "In undertaking this limited reweighing of the evidence, however, we are guided by the presumption that the factual findings of the trial court were correct." *Id.* at ¶ 12. "Accordingly, the weight to be given the evidence and the credibility of the witnesses are primarily questions to be answered by the trier of fact." *Id.*, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The rationale for this deference is the trier of fact is in the best position to view witnesses and observe their demeanor, voice inflections, and gestures. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Moreover, though sufficiency and manifest weight are different legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment. *See State v. Howze*, 10th Dist. No. 13AP-386, 2013-Ohio-4800, ¶ 10.

{¶ 11} In the present case, father does not dispute the trial court correctly found clear and convincing evidence establishes the situation described in R.C. 2151.414(B)(1)(d) and supports the permanent custody award. In other words, the evidence shows the children were in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1)(d).

{¶ 12} Once the trial court finds that one of the circumstances in R.C. 2151.414(B)(1)(a) through (d) applies, the trial court then must determine whether a grant of permanent custody is in the best interest of the child. R.C. 2151.414(B)(1). Here, father contests only the trial court's findings regarding the best interest factors. R.C. 2151.414(D) provides that, in determining the best interest of the child, the court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, out-of-home providers, and any other person who may significantly affect the child, (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem ("GAL"), with due regard for the maturity of the child, (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies

for 12 or more months of a consecutive 22-month period ending on or after March 18, 1999, (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency, and (5) whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child. The factors set forth in R.C. 2151.414(E)(7) through (11) include: (1) whether the parents have been convicted of or pled guilty to various crimes, (2) whether medical treatment or food has been withheld from the child, (3) whether the parent has placed the child at a substantial risk of harm due to alcohol or drug abuse, (4) whether the parent has abandoned the child, and (5) whether the parent has had parental rights terminated with respect to a sibling of the child.

{¶ 13} In his brief, father contests three findings. First, father argues the trial court erred when it found that the children had been abandoned. As pertinent to R.C. 2151.414(D)(5), the trial court found that the parents had abandoned the children, consistent with R.C. 2151.414(E)(10). Under its earlier analysis of R.C. 2151.414(B)(1)(b), the trial court also found the children had been legally abandoned because it had been over 90 days since either parent had visited the children.

{¶ 14} Father argues that although he did not visit the children for more than 90 days, the statute merely creates a rebuttable presumption, and beyond just missed visits, a finding of abandonment requires proof of intent to relinquish parental rights of custody permanently, not just temporarily. Father asserts there was evidence here that the visits conflicted with father's work schedule, that he tried to attend but missed the agency's cutoff times, and that father repeatedly expressed a desire to visit with all of his children at the same time, but his desire was not honored.

{¶ 15} R.C. 2151.011(C) provides that "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days."

{¶ 16} This court has rejected appellant's same argument in another case. In *In re D.P.*, 10th Dist. No. 06AP-780, 2007-Ohio-1703, this court held that "R.C. 2151.011(C) does not contain a requirement of any particular 'intent' on behalf of the parent; rather, the provision defines 'abandonment' solely in terms of the time between contacts." *Id.* at

¶ 7. *See also In re B.B.H.*, 10th Dist. No. 14AP-882, 2015-Ohio-2347, ¶ 34; *In re A.E.*, 10th Dist. No. 07AP-685, 2008-Ohio-1375, ¶ 26. Therefore, father's argument regarding his lack of intent to abandon the children is irrelevant.

{¶ 17} Father also contests the trial court's finding that the children wished to remain with their foster family. As pertinent to R.C. 2151.414(D)(2), the trial court found that both girls lived with their foster family for two years. This family includes the foster mother's adopted daughter, who is 12 years old, and another foster sibling, a girl who is 15 years old. The trial court stated that reports indicated the daughters feel extremely safe and secure in the foster home, each daughter expressed independently and without reservation that she wanted to remain living with the foster mother and did not want to live with father, and they indicated they felt safe at the foster home but not at their father's home. The daughters also indicated they understood permanent custody would remove father from their lives. The trial court also found that the daughters expressed their desire to maintain contact with father and their other siblings.

{¶ 18} Father argues the daughters' desires were not as clear as portrayed by the trial court. Father asserts that the daughters wished to maintain contact with the family, but the court never explained to them that contact could not be guaranteed if parental rights were terminated. Father also notes that R.J. indicated her desires changed from day to day, with wanting to live with father one day and wanting to stay with her foster family the next day. Father contends that it just happened that R.J. preferred her foster mother on the day of the in camera interview with the judge and GAL, who advocated keeping her in the foster home.

{¶ 19} However, the trial court's findings do, in fact, portray the points father raises above. The trial court specifically found that "[e]ach girl expressed these wishes giving indication that she understood the notion of the permanent removal of their father from her life." In their interviews with the trial court, the daughters also indicated that they understood the decision would be permanent. The trial court then acknowledged in its findings that "[d]espite wishes to remain permanently with [the foster mother] each girl expressed her desire to maintain contact with their father and other siblings." Thus, the trial court specifically addressed the concerns father raised above, and the court's findings accurately reflect the statements of the daughters. Furthermore, with regard to

father's argument that the daughters' desires changed from day to day, the magistrate found that "[e]ach girl expressed independently and without reservation that she wanted to stay living with [the foster mother] and did not want to return to live with her father." The interviews with the daughters support this finding. In addition, although R.J. told the trial court that "some days" she thought maybe she wanted to go live with her father instead of staying with the foster mother, she told the judge that she was comfortable with her decision to stay with the foster mother. Thus, although R.J. clearly exhibited uncertainty, she just as clearly indicated to the judge that she was comfortable with her final decision that she desired to have permanent custody granted and to continue living with her foster mother. We can find no error in the trial court's findings on these issues.

{¶ 20} Father also argues that because the trial court returned the sons to his custody, he is also able to care for his daughters. Father contends he has a good home, solid employment, and a spouse to help care for the children. Father also points out that if the daughters return to his custody, they would be able to spend time with their older siblings and extended family, which could not be guaranteed with an adoptive parent.

{¶ 21} However, the sons are in a different position than the daughters. The sons are older, 13 and 15 years old; while the daughters are only 9 and 12 years old. Given the age differences, the sons would be in a better position to protect/care for themselves and report any emerging issues, as opposed to the daughters, who are more vulnerable due to their younger age. Consistent with this fact is that the GAL indicated that his primary concern with returning the sons to their father was father's ability and/or willingness to fully supervise them. Given this concern, the daughters' younger ages put them at greater risk under father's custody.

{¶ 22} Furthermore, the trial court analyzed the relevant factors differently for the sons than it did for the daughters. The sons were not thriving in foster care, while the daughters were. The trial court found that the sons were bonded to their father and not bonded to a foster family, while the daughters were bonded to their foster mother. The sons also had numerous placements, while the daughters had only one prior placement. The trial court also found that the sons were not in a foster home that could become an adoptive home, while the daughters were in such a home. Because of this, the court concluded that the sons were not likely candidates for permanent adoption before

reaching the age of majority, and permanent termination of the sons' ties to father was not likely to give them any chance at permanency. The court also noted that the sons clearly desired to return to father's custody, with De.H. being "emotionally torn by his desperation to get back to his father" and "unequivocal" in his desire to return to father's custody. To the contrary, the daughters specifically indicated they did not wish to be returned to father's custody and desired to stay in their foster home. Thus, the trial court clearly viewed the circumstances surrounding the sons and the daughters very differently, and the record and in camera interviews with the children support such view.

{¶ 23} Based on the foregoing, the trial court's determination that father's parental rights should be terminated with regard to I.H. and R.J. was supported by clear and convincing evidence. The trial court's analysis was extremely thoughtful and thorough, and supported by clear, concise findings supported by the record and in camera interviews. Therefore, father's sole assignment of error is overruled.

{¶ 24} Accordingly, father's sole assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is affirmed.

*Judgment affirmed.*

TYACK, P.J., and DORRIAN, J., concur.

_____