[Cite as *In re M.D.*, 2019-Ohio-3674.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| M.D. and A.D. | : | No. 18AP-786 |
| | | (C.P.C. No. 15JU-9691) |
| (D.D., | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant). | : | |

---

D E C I S I O N

Rendered on September 12, 2019

---

**On brief:** *Yeura R. Venters*, Public Defender, and *Ian J. Jones*, for appellant.

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services.

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

SADLER, J.

{¶ 1} Defendant-appellant, D.D., appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, awarding permanent custody of D.D.'s two minor children, M.D. and A.D., to plaintiff-appellee, Franklin County Children Services ("FCCS").

**I. FACTS AND PROCEDURAL HISTORY**

{¶ 2} On August 5, 2015, FCCS filed a three-count complaint in the juvenile court alleging that M.D., born July 3, 2002, and A.D., born November 21, 2003, were both neglected and dependent children. The complaint identified the biological parents of the two minor children as mother, D.D., and father, R.D., who were married and residing with the two minor children in Franklin County, Ohio. The material allegations of the complaint are as follows:

On or about August 4, 2015, the Franklin County Children Services caseworker went to the home of [M.D.], [A.D.] and their parents. The home had no stove, no hot water, and very little food. * * * [M.D.] and [A.D.] had noticeable body odor and their clothes and hair were dirty. [M.D.] and [A.D.] had dirt caked under their fingernails and bites all over their bodies in various stages of healing. * * * The home had an infestation of bed bugs. It is reported the family does laundry at a relative's home; however they had not done laundry in recent weeks. [R.D.] had a toilet chair that was located in the living room that he used due to his physical limitations. * * * [D.D.] was unable to respond to the [FCCS] caseworker about the basic care of [M.D.] and [A.D.] It is also reported that [M.D.] has been diagnosed with a medical condition that requires insulin. [M.D.] had been using her father's insulin and insulin procured from an adult family friend. The insulin had not been prescribed by a physician. Columbus Police Officers were contacted[.] [M.D.] and [A.D.] were transported to [FCCS] for safekeeping, [FCCS] was given custody via LAW. [M.D.] was then assessed by medical staff and it was determined that it was necessary to transport her to Nationwide Children's Hospital Emergency Department due to an elevated blood sugar level. After review of [M.D.'s] case by Nationwide Children's Hospital Endocrinology Clinic, a direct inpatient hospital admission was recommended due to [M.D.'s] uncontrolled medical condition. The * * * family had been under investigation in the State of Indiana by child welfare officials recently for similar concerns as well.

(Aug. 5, 2015 Compl. at 1-2.)

{¶ 3} On August 5, 2015, a magistrate issued an emergency care order for the children, and on August 6, 2015, the magistrate awarded temporary custody of the two minor children to FCCS. A guardian ad litem ("GAL") was appointed for the children, and on September 8, 2015, the GAL recommended an order of temporary custody to FCCS. At the September 8, 2015 hearing before the magistrate, the parents did not contest the allegations of neglect, as defined in R.C. 2151.03(A)(2), and dependency, as defined in R.C. 2151.04(C). The juvenile court issued a judgment entry on September 14, 2015, adopting the magistrate's decision, finding M.D. and A.D. were dependent and neglected children and awarding temporary custody to FCCS. A case plan was adopted by the juvenile court on October 22, 2015.

{¶ 4}   On August 18, 2016, following the second semi-annual review, the juvenile court found, pursuant to R.C. 2151.415(D)(1), that clear and convincing evidence supported the extension of temporary custody to FCCS.   On December 5, 2016, FCCS moved the juvenile court for permanent court commitment ("PCC") of both M.D. and A.D.   On January 9, 2017, the GAL recommended PCC.

{¶ 5}   Following the semi-annual review filed on August 2, 2017, the juvenile court appointed a GAL for both mother, D.D., who is hearing impaired and suffers from mental illness, and father, R.D., who suffers from physical disability.   On October 25, 2017, D.D.'s GAL filed a report wherein the GAL recommended that PCC was not in the mother's best interest, but the GAL retained the right to change the recommendation with the receipt of new information.

{¶ 6}   The juvenile court appointed counsel to represent both D.D. and R.D. in the PCC matter.   On March 26, 2018, FCCS filed a motion to temporarily suspend the parents' visitation due to allegations of sexual abuse made by M.D. against her father, R.D.   R.D. died on April 10, 2018, and on April 11, 2018, FCCS withdrew the pending motion to suspend visitation.

{¶ 7}   On June 7, 2018, the GAL for the minor children issued a report and recommendation wherein the GAL recommended PCC.   On June 28, 2018, the children's maternal aunt, A.W., filed her pro se motion to be added as a party to the custody action for the purpose of seeking legal custody of M.D. and A.D.

{¶ 8}   On August 13, 2018, following numerous continuances for various reasons, the juvenile court commenced a two-day trial on FCCS's December 5, 2016 motion for PCC. The following evidence was presented at trial.   A.W. testified she lives in Alabama and is related to the children as an aunt.   A.W. admitted she had not seen M.D. and A.D. since 2011 or 2012 when she lived in Indiana.   A.W. stated that D.D. has recently moved in with her and A.W.'s 17-year-old daughter.   A.W. wanted custody of the girls because they are part of her family, and she loves them.   She believes the children should be with a family member and "know where they came from."  (Aug. 13, 2018 Tr. at 13.)

{¶ 9}   A.W. asserted she would still want to have custody of the children, even if the children wished to stay with their foster parent.   According to A.W., D.D. was not at fault

for the circumstances that led to the removal of the children because she "was just caught in a circumstance out of her control." (Aug. 13, 2018 Tr. at 17.)

{¶ 10} Suzanne Barker, the GAL for the two children, testified M.D. and A.D. are "very bonded" with their foster mother and wish to be adopted by her. (Aug. 13, 2018 Tr. at 29.) She stated M.D. and A.D. are now 16 and 14 years old, respectively. The GAL testified the two children disclosed to their foster mother abuses they suffered when living with D.D. According to the GAL, both children have told her they do not want to live with their mother, and they do not know their maternal aunt, A.W. The GAL represented to the juvenile court that both children want the motion for permanent custody to be granted.

{¶ 11} Dianna Lippencott is a licensed drug and alcohol counselor who works at Specialized Alternatives for Families and Youth where she provides therapy and home-based services. Lippencott has been providing therapy to the girls since May 2017, under the supervision of Dr. Jeremy Kaufman, Psy.D. According to Lippencott, M.D. has been diagnosed with depression, oppositional defiant disorder, and PTSD. Lippencott opined that M.D. shows signs of trauma.

{¶ 12} M.D. told Lippencott that D.D. was asleep most of the time while she and her sister were living with their parents. M.D. told Lippencott that she was required to make her own food, and the house was very dirty. M.D. believed D.D. was not capable of caring for herself. After entering FCCS's custody, M.D. did not wish to see her father and did not visit with him for more than one year prior to his death. During this time period, M.D. did not want to visit D.D. either because she was together with her father. She did wish to see her mother once or twice to see how she was doing. In Lippencott's opinion, M.D.'s decision to forego visitation with her parents benefited M.D.'s mental health.

{¶ 13} Lippencott stated that M.D. was struggling with her diabetes symptoms and behaviors such as food stealing and binging when she first went into foster care, but "she's made some improvements." (Aug. 13, 2018 Tr. at 155.) According to Lippencott, M.D. now "smiles more. * * * [H]er mood is more positive. She enjoys activities." (Aug. 13, 2018 Tr. at 157.) Lippencott testified M.D. now takes antidepressant medications. When M.D. visited her mother after her father's death, she expressed relief that "Mom was okay and that she was managing without Dad." (Aug. 13, 2018 Tr. at 158.)

{¶ 14} With regard to A.D., Lippencott testified A.D. is diagnosed with "adjustment disorder, and then she's developmentally delayed." (Aug. 13, 2018 Tr. at 159.) According to Lippencott, A.D. has displayed some signs of trauma, but she is generally "more laid back" than M.D. and "more positive." (Aug. 13, 2018 Tr. at 159.) Lippencott stated that "[w]hen she came to us, she had a pretty se -- they both had a pretty severe case of lice that took quite a while to get rid of. She has a lot of hygiene problems, not showering, not changing clothes." (Aug. 13, 2018 Tr. at 160.)

{¶ 15} When Lippencott was asked if the children's mental health was improving, she testified:

> A. Yes. I would say that they're doing much better than they were, and they -- a lot of times the -- the kids can tell you, I'm feeling so much better. They do look forward to the counseling, and they always have positive -- they express positive feelings about having it. So, a lot of times the kids will tell you, like, I'm feeling better and I don't feel like I need it as much.
>
> Q. Have you reached that point with either of these children?
>
> A. N -- not yet.

(Aug. 13, 2018 Tr. at 163.)

{¶ 16} Sally Pedon testified she has been the court-appointed special advocate for the two children for the last two years. According to Pedon, the girls want to be adopted by the foster mother because she provides a safe, stable, caring, and nurturing home meeting all their needs. Pedon testified the girls are bonded to each other and want to stay together. Pedon opined that "[b]ased upon the case records and the history of the family with Child Protective Services in two different states, I don't believe that [D.D.] * * * is capable of providing the stability, the care, the nurturing, the attention that both girls need." (Aug. 14, 2018 Tr. at 26-27.) Pedon had no opinion regarding A.W., whom she first learned of around June 21, 2018. Pedon recommended the motion requesting permanent custody be granted.

{¶ 17} Tawnee Tanner is a forensic psychologist who worked at Forum from October 2016 to January 2018 performing assessments for FCCS of children and parents. Tanner performed a psychological evaluation of D.D. Tanner testified D.D.'s IQ was 78, which is the borderline functioning range, and D.D. demonstrates a borderline ability to make decisions, as well as borderline memory and vocabulary. According to Tanner, D.D. denied

any current difficulties but acknowledged a history of depressive symptoms and suicidal ideation. Tanner noted that Childrens Services' records showed D.D. suffered physical abuse at the hands of her own mother.

{¶ 18} Tanner diagnosed D.D. with borderline intellectual functioning as a provisional diagnosis and recurrent major depressive disorder. Tanner related the effect of major depressive disorder on one's ability to parent as follows:

> With major-depressive disorder an individual may be less motivated, less likely to get out of bed in the morning and perform daily activities, such as eating, making food, cleaning, even bathing themselves or -- and that makes it more difficult to take care of other people if they're having difficulty taking care of themselves, just kind of -- can also slow you down a lot, making it more difficult to do daily activities.

(Aug. 14, 2018 Tr. at 76-77.)

{¶ 19} Tanner recommended that D.D. continue her current psychotropic medication, meet her prescriber on a regular basis, engage in individual therapy, either cognitive behavioral or dialectical behavior, attend parenting classes, and improve her overall hygiene. Tanner opined that the parenting classes and individual therapy would need to be delivered in a more repetitive or simplistic manner and for the therapist to use sign language. According to Tanner, D.D. would need to work on herself and be able to demonstrate that she could deal with everyday stressors, demonstrate that she could keep a clean home, and deal with extra stressors of a child with diabetes. Tanner cautioned that if D.D. discontinued medication or individual counseling, the depressive symptoms would worsen, resulting in a lack of motivation needed to complete a case plan or attend visits.

{¶ 20} FCCS supervisor Michael Schilling testified, on receiving the case, the main issues were getting D.D. linked with counseling, home conditions, and trying to get D.D. more consistent with visitation. Schilling testified the father, R.D., reported that D.D. was on a wait list for counseling but that D.D. did not feel she needed counseling. Schilling testified home conditions were a continual problem due to animal feces in the home and the failure of the father to effectively treat the bedbugs.

{¶ 21} According to Schilling, visits were suspended at one point due to failure to treat lice and that the parents' subsequent lack of cooperation with efforts to treat the infestation prevented reinstatement of visits with the children. Schilling stated that visits

were also suspended until the father completed an evaluation necessitated by M.D.'s sexual abuse allegations. R.D. died before the evaluation occurred. Schilling testified in the four-month period before visitation was suspended, D.D. and R.D. visited the children 3 or 4 times and stayed just 30 to 45 minutes. Schilling acknowledged some of the missed visits were due to double scheduling of the children by the foster mother but that the foster mother worked with FCCS to encourage the children to visit with their parents and to schedule as many visits as possible. Schilling stated no other relatives inquired of the children while he was supervising the case.

{¶ 22} D.D. testified at the custody hearing with the aide of an interpreter for the hearing impaired. D.D. stated that she was married to R.D. on November 10, 2001. She testified she is currently living in Alabama with her sister, A.W. In the summer of 2015, just prior to the time when her two daughters, M.D. and A.D., were taken into the temporary custody of FCCS, the family was living with R.D.'s step-aunt. When the family moved in with the step-aunt after leaving Indiana and staying briefly in Michigan, they had two dogs as pets, and the step-aunt had five dogs and two cats. According to D.D., she slept in their van parked in the yard because of the animals, flies, and fleas in the home; the children slept in the home.

{¶ 23} According to D.D., shortly after the family moved into an apartment, an FCCS representative and the landlord showed up at the door. According to D.D., she let the case worker into the home and M.D. showed her around. D.D. stated that her husband had heart problems, and he used oxygen and a wheelchair. R.D. kept a portable toilet chair in the living room because he could not quickly get up the stairs to the bathroom. During her testimony, D.D. essentially corroborated many of the factual allegations made in the complaint regarding the condition of the home, but she deflected responsibility for those conditions onto the prior tenants. She also blamed others for A.D.'s head lice and M.D.'s dangerously high blood sugar, which required hospitalization. She also stated that A.D. had to be constantly reminded to brush her teeth and bathe.

{¶ 24} D.D. testified that she and R.D. moved into another residence when the children were taken by FCCS but that residence had bed bugs and her landlord would not treat the home for bed bugs. She stated visitation with the children had to be suspended because of the issues with lice and bed bugs. D.D. denied that she ever had lice or bed bugs

on her person when she visited the children. She did admit that visits were suspended from December 2016 to July 2017 because the home they lived in was infested with bed bugs. She also admitted that the kitchen in the home was infested with cockroaches. She recalled that R.D. cancelled numerous appointments to have their required psychological evaluations completed.

{¶ 25} D.D. testified when visits were reinstated in the summer of 2017, M.D. refused to visit her parents and that A.D. told her the foster mother, "Ms. [T.]," limited A.D.'s visits to 30 minutes. (Aug. 13, 2018 Tr. at 102.) On the next scheduled visitation, both children refused to go. Several subsequent visits in September 2017 were cancelled by R.D. as were four consecutive visits in October 2017. On October 29, 2017, both children refused to attend. After R.D. cancelled two consecutive visits in November 2017, visitation was suspended. M.D. subsequently made the allegations of sexual abuse by R.D. With regard to the allegations, D.D. testified "I personally do not believe her." (Aug. 13, 2018 Tr. at 104.) When asked about M.D.'s testimony that D.D. was sleeping all the time and suffering from depression while they lived in Indiana, D.D. said "she's lying about that and the sexual abuse by [R.D.]" (Aug. 13, 2018 Tr. at 108.) D.D. admitted they lived in an old trailer in Indiana, and it needed repairs and maintenance from time to time, but she denied that child welfare authorities in Indiana found deplorable living conditions.

{¶ 26} With regard to her mental health, she admitted a diagnosis of major depressive disorder. She claimed a physician who performed her mental health assessment at North Central Mental Health in August 2016 never recommended counseling. She insisted the physician only prescribed medication for depression. She maintained, however, that she recently scheduled an appointment to start counseling in Alabama, but the appointment had to be cancelled because there was no interpreter provided.

{¶ 27} She admitted that she did not hug her children when they left the courtroom after being interviewed by the juvenile judge because she was upset. She acknowledged when M.D. tried to give her a hug, she said "[n]o, don't touch me." (Aug. 13, 2018 Tr. at 128.) She claimed she was not mad at the children for what they told the judge but that she was just upset and wanted to cry.

{¶ 28} On September 18, 2018, the juvenile court issued a decision and judgment entry wherein the court reached the following conclusion:

> The Court DENIES [A.W.]'s motion to be added as a party and DISMISSES her motion for custody. The Court has carefully reviewed the testimony and evidence presented, the entire file, and the applicable law. The Court hereby finds that Permanent Custody is in [M.D.'s] and [A.D's] best interest. Accordingly, the Court hereby GRANTS FCCS's request for Permanent Custody. Therefore, [M.D.] and [A.D.] are committed to the Permanent Custody of FCCS for the purposes of adoption.
>
> Based upon the foregoing findings of fact, and pursuant to R.C. §2151.417, the Court hereby determines that continuation in the children's own home would be contrary to the children's best interests; that Franklin County Children Services has made reasonable efforts to prevent or eliminate the need for removal of said children from the children's own home. Reasonable efforts have also been made to finalize the permanency plan in effect for the children.
>
> This Decision and Judgment Entry divests the mother, [D.D.], of any and all parental rights, privileges, and obligations except the right of the mother to appeal the Permanent Custody Order within thirty (30) days of the filing date of this Decision and Judgment Entry.

(Sept. 18, 2018 Decision at 18-19.)

{¶ 29} D.D. has appealed to this court from the decision of the juvenile court. A.W. did not file a notice of appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 30} D.D. assigns the following as trial court error:

> [1.] The trial court's granting of PCC to FCCS was against the manifest weight of the evidence that PCC was in the children's best interests.
>
> [2.] The trial court erred by failing to add [A.W.] as a party and by dismissing her motion for custody of the children.

## III. LEGAL ANALYSIS

### A. Appellant's First Assignment of Error

{¶ 31} In her first assignment of error, D.D. argues that granting PCC to FCCS was against the manifest weight of the evidence in that the evidence does not support the juvenile court's conclusion that PCC was in the best interest of M.D. and A.D. We disagree.

{¶ 32}  *In re E.B.*, 10th Dist. No. 16AP-352, 2017-Ohio-2672, sets forth the standard of review this court applies in reviewing a manifest weight challenge to a juvenile court's judgment granting PCC.  The standard is as follows:

> A trial court's determination in a PCC case will not be reversed on appeal unless it is against the manifest weight of the evidence.  In reviewing a judgment granting permanent custody to FCCS under the manifest weight standard, an appellate court must make every reasonable presumption in favor of the judgment and the trial court's findings of facts.  If the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the juvenile court's verdict and judgment.  An appellate court will not overturn a permanent custody order when it is supported by competent, credible evidence.

 (Internal citations and quotations omitted.)  *Id.* at ¶ 19.

{¶ 33}  Parents have a basic and fundamental interest in the care, custody, and management of their children.  *Id.*, citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  "The Supreme Court of Ohio recognizes that it is the constitutionally protected right of a parent to raise his or her child."  *In re E.B.* at ¶ 19, citing *In re Murray*, 52 Ohio St.3d 155, 157 (1990); *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28.  "Parental rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child."  *In re E.B.* at ¶ 19, citing *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 15, citing *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶ 34}  There is no dispute in this matter that M.D. and A.D. had been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period.  R.C. 2151.414(B)(1)(d).  Consequently, the merit of FCCS's motion in this case resolves to a determination of the best interest of M.D. and A.D.  *In re I.H.*, 10th Dist. No. 16AP-463, 2017-Ohio-815, ¶ 7.  In order for the juvenile court to grant a motion for permanent custody, pursuant to R.C. 2151.414(B)(1), FCCS must prove by clear and convincing evidence that PCC is in the best interest of the child.  *Id.*  R.C. 2151.414(D) sets forth the factors the juvenile court must consider in determining whether PCC is in the child's best interest.  R.C. 2151.414(D) provides in relevant part as follows:

> (1)  In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of

division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

For the purposes of division (D)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

## 1. R.C. 2151.414(D)(1)(a)

{¶ 35} Subsection (a) requires the juvenile court to consider the interaction and interrelationship of the children with their parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child. The juvenile court found M.D. and A.D. are bonded with each other and with their foster mother. The juvenile court noted both M.D. and A.D. showed gratitude and appreciation for the way their foster mother has treated them. Overwhelming evidence supports the juvenile court's finding.

{¶ 36} The juvenile court found the visitation history with the parents was "inconsistent at best." (Sept. 18, 2018 Decision at 8.) The record supports the juvenile court's finding as visitation was suspended on one occasion due to persistent problems with bed bugs, lice, and cockroaches. Visitation was suspended another time due to the parents' missing or cancelling numerous scheduled visits. FCCS filed a third motion to suspend visitation when M.D. made the allegations of sexual abuse against R.D. The motion was withdrawn following R.D.'s death. The record also shows that one or both of the children refused visitation with their parents on several occasions. Though the juvenile court noted the absence of any testimony regarding the interaction between the children and their parents when visits did occur, the record shows that A.D. limited her visits to 30 minutes and that she only wished to visit her mom. The record supports the juvenile court's findings. Though the juvenile court acknowledged D.D.'s claim that R.D.'s controlling behavior was the reason she missed so many visits, the juvenile court noted that D.D. did not complain about these behaviors to anyone.

{¶ 37} The juvenile court noted that M.D.'s behaviors when FCCS became involved included lying, yelling at her foster mother, stealing, and binging on food. The juvenile court found M.D. has shown improvement in her behavior while in foster care and the evidence in the record supports that finding. The record also supports the juvenile court's finding that M.D.'s mood has improved in foster care and that she has become more positive and less anxious. M.D.'s physical health has also improved with more vigilant care of her diabetes.

{¶ 38} With regard to A.D., the juvenile court found A.D.'s issues with lying and stealing have abated, and she has improved hygiene since entering foster care. She now has an individual educational plan ("IEP") to help her overcome her developmental disabilities. Thus, the record supports the juvenile court's finding that both children have shown improved behaviors and attitudes with counseling and both have taken to their respective counselors.

{¶ 39} The juvenile court acknowledged that both children care for their mother and want to maintain a connection with her and that D.D. loves her children. However, given the unsanitary conditions in which they lived, the lack of food and medical care, their

father's physical disabilities and their mother's depression, the children's interactions with D.D. have not been positive.

### 2. R.C. 2151.414(D)(1)(b)

{¶ 40} Subsection (b) requires the juvenile court to consider the wishes of the child, as expressed directly by the child or through the child's GAL, with due regard for the maturity of the child. In our view, given the age of the two children, this factor holds a great deal of sway over the custody determination in this case. Both M.D. and A.D. unequivocally expressed their desire to remain together with their foster mother and be adopted by her.

{¶ 41} D.D. argues the children's testimony suggests they do not want to sever the parent-child relationship. However, when the GAL asked A.D. about her wishes, she expressed the following:

> MS. BARKER: Yeah. Have you guys also talked about if she did get to adopt you, what your relationship with your mom would look like?
>
> [A.D.]: Yes.
>
> MS. BARKER: What did you guys talk about?
>
> [A.D.]: She said we would get to see her sometimes, not all the time.
>
> MS. BARKER: Okay. So, how often would you want to see your mom?
>
> [A.D.]: Like, once every si -- like, three or four times out of six months.

(Aug. 13, 2018 Tr. at 58.)

{¶ 42} M.D. expressed similar sentiments when asked about her desires:

> MS. BARKER: Do you think Ms. [T.] would support you having a relationship with your family?
>
> [M.D.]: I mean, me and Ms. [T.] have had this conversation before, she said that'd be fine.
>
> MS. BARKER: Yes. So, did you guys talk about what that would look like?
>
> [M.D.]: She asked me if I wanted to visit Mom and then she asked me, like, what time? I said because they live in Alabama, maybe once or twice every six months.

(Aug. 13, 2018 Tr. at 44.)

{¶ 43} Though the children's testimony shows they want to maintain a relationship with their biological mother, it is clear the children do not want their mother to have custody, and they want to stay in the custody of their foster mother with the hope of adoption. When the juvenile court judge asked M.D. about her aunt, A.W., M.D. stated that she did not know whether A.W. could provide her with the stable home life that her foster mother has provided for the last four years.

{¶ 44} When the juvenile court asked 14-year-old A.D. why she was in the courthouse, she responded "[t]o see if we're gonna (sic) go home or get adopted." (Aug. 13, 2018 Tr. at 50.) A.D. testified she sees herself with her foster mother and wants to be adopted by her. She told the juvenile court that she wished to be adopted by her foster mother even if that meant she could not see her biological mother. She stated that her foster mother "cooks for us; she -- she gives us clothes and shoes; she takes us places. * * * Bowling, skatin' (sic), swimming." (Aug. 13, 2018 Tr. at 54.) She stated she loves her foster mother, her foster mother loves her, and she likes living with her sister. A.D. stated she was not happy living with her biological mother and father because "I didn't get fed all the time and it was dirty." (Aug. 13, 2018 Tr. at 56.)

### 3. R.C. 2151.414(D)(1)(c)

{¶ 45} The record shows at the time of the PCC hearing, M.D. and A.D. had been in the uninterrupted custody and care of their foster mother for more than three years. Thus, there is no dispute that this factor favors permanent custody to FCCS in anticipation of adoption.

### 4. R.C. 2151.414(D)(1)(d)

{¶ 46} Subsection (d) requires the juvenile court to consider the children's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. There is no doubt on this record that proper consideration of this factor favors an award of permanent custody to FCCS.

{¶ 47} M.D. suffers from Type 1 diabetes which requires daily monitoring of her blood sugar and injectable insulin. She has also been diagnosed with depression and PTSD. Though her current age of 16 years better prepares her to monitor and care for her condition, her condition was uncontrolled while she lived with her parents. A.D. has been diagnosed with adjustment disorder, and she is developmentally delayed. She requires an

IEP to help her at school due to her developmental disabilities. As previously noted, FCCS has had temporary custody of both children since August 2015. Thus, the record overwhelmingly supports the juvenile court's determination that M.D. and A.D. are "in great need of legally secure permanent placement." (Sept. 18, 2018 Decision at 12.)

{¶ 48} The record also supports the juvenile court's finding that legally secure permanent placement cannot be achieved without granting permanent custody to FCCS. Our review of the record reveals little or no evidence to support a finding that returning the girls to their mother's custody would result in legally secure permanent placement. The record clearly establishes that D.D. has never provided the children with a safe and secure home.

{¶ 49} D.D. makes two arguments in support of custody. First, she claims because R.D.'s controlling behavior caused her to lose custody of the two children, R.D.'s death removes the impediment to a return of legally secure permanent custody. Second, she argues A.W.'s emergence as a person willing and able to provide assistance to her in raising the girls shows that she can provide a legally secure permanent home for the children. The juvenile court was not persuaded by these arguments.

{¶ 50} With regard to the first point, the juvenile court viewed D.D.'s claim with skepticism. The juvenile court stated:

> If, indeed, now mother is free of an isolating, controlling husband, the court wonders why she did not enjoy her independence and remain geographically close to her children, and why she has yet to enter mental health counselling. The court believes mother knows she needs help to care for herself and with the death of her husband, sought that help in her sister who may not yet fully realize the extent of mother's needs, nor the needs of these two children. Mother has not remedied the cause, for removal and the children should not and cannot be returned to her within a reasonable time.

(Sept. 18, 2018 Decision at 17.)

{¶ 51} The record supports the juvenile court's ruling in that M.D. expressed her concern for her mother's well-being after R.D.'s death because, in her experience, R.D. provided a great deal of support for D.D. M.D. opined that D.D. could not take care of herself. Additionally, A.W. estimated it would take D.D. about one year to obtain a driver's license, get a job, which would affect her Social Security benefits, complete her mental

health treatment, and obtain suitable alternative housing. Even if A.W.'s estimate were accurate, another year in foster care would not strengthen D.D.'s case for custody. Moreover, there is no evidence in this record to support a finding that D.D. could become a suitable parent within any predictable period of time, let alone one year.[1]

### 5. R.C. 2151.414(D)(1)(e)

{¶ 52} The juvenile court found, and the parties agree, that none of the factors in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and children in this case.

### 6. PCC is in the Best Interest of M.D. and A.D.

{¶ 53} R.C. 2151.414 governs the procedure for granting permanent custody of a child to a children's services agency such as FCCS. *In re I.H.*, 2017-Ohio-815, at ¶ 7. Under R.C. 2151.414(B)(1), a trial court may grant permanent custody to an agency if the court determines by clear and convincing evidence that: (1) it is in the best interest of the child; and (2) one of the circumstances set forth in R.C. 2151.414(B)(1)(a) through (d) applies. *Id.* Clear and convincing evidence is that measure or degree of proof which is more than a mere preponderance of the evidence, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases, and that will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Id.*, citing *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42, citing *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 54} There is no dispute in this case that, pursuant to R.C. 2151.414(B)(1)(d), M.D. and A.D. have been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period. Following the evidentiary hearing, the juvenile court concluded that FCCS had proven by clear and convincing evidence that PCC was in the best interest of M.D. and A.D. Though the juvenile court did not specify which of the factors set forth in R.C. 2151.414(D)(1)(a) through (e) favored PCC, the juvenile court's decision and the evidence in the record establishes that all applicable factors favor PCC.

{¶ 55} The record shows a total of six semi-annual reviews were conducted in this case, three separate case plans were issued, and temporary custody to FCCS was extended. Though some progress was noted in the reviews, there is no evidence that D.D. ever

---

[1]Counsel for FCCS explained to the juvenile court the placement process via the Interstate Compact for Placement of Children would take six to nine months to complete, and the GAL told the juvenile court the children would oppose a move to Alabama.

completed the case plan. On this record, in order to justify the return of M.D. and A.D. to their mother's custody, the juvenile court would have been required to disregard the children's unequivocally stated wishes, sever the loving and nurturing relationship with their foster mother that has developed over nearly four years, separate the children from their current out-of-home providers, and permit the children to be moved to Alabama to live with a maternal aunt whom they do not know and a mother who suffers from mental illness and did not provide them with a safe and secure home. The juvenile court would also be required to disregard the recommendations of both the GAL and lay GAL. In our view, the record contains overwhelming evidence to support the conclusion that PCC is in the best interest of M.D. and A.D.

{¶ 56} Based on the foregoing, we hold the juvenile court's judgment granting FCCS's motion for PCC is not against the manifest weight of the evidence. Accordingly, we overrule D.D.'s first assignment of error.

### B. Appellant's Second Assignment of Error

{¶ 57} D.D.'s second assignment of error challenges the portion of the juvenile court's decision and judgment entry that denies A.W.'s motion to be added as a party and "dismisses" A.W.'s motion for legal custody. (Sept. 18, 2018 Decision at 18.) FCCS argues that D.D. does not have standing to make such a challenge in her appeal. We agree.

{¶ 58} As a general rule, "[o]nly litigants with standing are entitled to have a court determine the merits of the claims they have presented." *In re S.G.D.F.,* 10th Dist. No. 16AP-57, 2016-Ohio-7134, ¶ 11, citing *Moore v. Middletown*, 133 Ohio St.3d 55, 2012-Ohio-3897, ¶ 20. "A party has standing when they have a ' "right to make a legal claim or seek judicial enforcement of a duty or right." ' " *In re S.G.D.F.* at ¶ 11, quoting *Ohio Pyro, Inc. v. Ohio Dept. of Commerce*, 115 Ohio St.3d 375, 2007-Ohio-5024, ¶ 27, quoting *Black's Law Dictionary* 1442 (8th Ed.2004). "Similarly, a party who attempts to appeal a judgment must meet standing requirements to invoke the jurisdiction of the appellate court." *In re S.G.D.F.* at ¶ 11, citing *Ohio Contract Carriers Assn. v. Public Util. Comm. of Ohio,* 140 Ohio St. 160, 161 (1942). "One of these requirements is that a party who seeks to appeal must assert his own rights." *In re S.G.D.F.* at ¶ 11, citing *In re N.G.*, 1st Dist. No. C-130684, 2014-Ohio-720, ¶ 7.

{¶ 59} In the context of child custody proceedings, this court has previously stated " '[a]n appellant cannot raise issues on another's behalf, especially when that party could have appealed the issues appellant posits.' " *In re S.G.D.F.* at ¶ 14, quoting *In re D.T.*, 10th Dist. No. 07AP-853, 2008-Ohio-2287, ¶ 8. More recently, in *In re J.P.*, 10th Dist. No. 18AP-834, 2019-Ohio-1619, this court held that a parent had standing to raise arguments regarding the possibility of a relative assuming legal custody of a child but only to the extent that those arguments challenge the decision to terminate the parent's rights. *Id.* at ¶ 27.

{¶ 60} Though A.W. was not a party in the juvenile court proceedings, she clearly had standing to appeal the adverse ruling on her motion to intervene as a party. *In re D.T.* at ¶ 8, citing *In re J.W.*, 10th Dist. No 06AP-864, 2007-Ohio-1419, ¶ 24, citing *In re Fusik*, 4th Dist. No. 02CA16, 2002-Ohio-4410. *See also In re C.G.*, 12th Dist. No. CA2007-03-005, 2007-Ohio-4361 (an order denying a motion to intervene constitutes a final, appealable order). Accordingly, it was A.W., and not D.D., who had standing to appeal from the judgment denying A.W.'s motions to intervene. *In re D.T. See also In re J.D.*, 7th Dist. No. 14 MA 33, 2014-Ohio-5726, ¶ 68-73 (determining that mother lacked standing to argue that trial court erred by denying grandparent's motion to intervene in permanent custody action); *In re L.W.*, 8th Dist. No. 104881, 2017-Ohio-657, ¶ 23 (a parent has no standing to argue an abuse of discretion occurred in failing to give the grandmother custody but has standing to challenge only whether the termination of parental rights was proper); *In re Qu.W.,* 11th Dist. No. 2015-A-0016, 2015-Ohio-2202, ¶ 41 (appellant/father must confine his challenge to how the court's award of permanent custody to the agency impacted his rights and not the rights of relatives); *In re S.C.*, 8th Dist. No. 106701, 2018-Ohio-2523, ¶ 16 (parent has no standing to assert a juvenile court abused its discretion by failing to grant a relative legal custody; rather, the challenge is limited to how the court's decision impacted the parent's rights).

{¶ 61} Nevertheless, we are aware other appellate courts have held an appellant has standing to raise the denial of a relative's motion to intervene in a child custody proceeding, to the extent the denial impacted appellant's parental rights. *In re S.G.*, 3d Dist. No. 4-16-13, 2016-Ohio-8403, ¶ 51-53 (considering father's argument that trial court erred by denying grandparent's motion to intervene in permanent custody decision to the extent that it "impacted [the father's] rights"); *In re Mourey*, 4th Dist. No. 02CA48, 2003-Ohio-

1870, ¶ 20-21 (mother and grandparent interests might align when both oppose placing child in children services agency's permanent custody such that mother had standing to argue trial court erred by denying grandparent's motion to intervene). However, even if we were to conclude that, under the particular facts of this case, D.D. has standing to appeal the denial of her sister's motion to intervene, it is clear that the juvenile court did not err in denying the motion.

{¶ 62} A.W. testified that D.D. now lives with her in Alabama. She testified she has a five-bedroom home where she lives with her 17-year-old daughter and D.D. A.W. stated she lived in Indiana prior to moving to Alabama and that she last saw the girls in 2011 or 2012 when they were living in Portage, Indiana. A.W. claimed that she did not know the girls' whereabouts after M.D. and A.D. moved to Ohio with their parents.

{¶ 63} A.W. testified she found out that the two children were in foster care when she contacted D.D. in April 2018. According to A.W., R.D. was in the hospital at that time and that R.D. died shortly thereafter. A.W. testified she contacted FCCS, and FCCS sent her some materials explaining how "to go about getting the kids to come live with [her]." (Aug. 13, 2018 Tr. at 11.) According to A.W., when she traveled to Ohio for one of the court hearings, she learned nothing had been done to support her request to have the children with her. She did visit with the children at that time.

{¶ 64} A.W. blamed R.D.'s controlling behavior for her loss of contact with the children. She responded affirmatively when the juvenile court asked her if she wanted custody of the children even "if their wishes were other than to have you have custody and for them to live with you and their mother." (Aug. 13, 2018 Tr. at 14.) In denying A.W.'s motion to intervene and dismissing her motion for custody, the juvenile court stated:

> Because this motion was filed less than two months before trial and, if granted, would result in a lengthy continuance for an interstate compact investigation; the aunt was not remembered by the teenage girls who had no relationship with her and no desire to live with her; and, because this case is over three years old, the court dismissed that motion and dismissed the motion for custody.

(Sept. 18, 2018 Decision at 2.)

{¶ 65} In the proceedings on A.W.'s motion, the juvenile court also noted that A.W. did not show that "she was ever in loco parentis" with the children.  (Aug. 13, 2018 Tr. at 36.)

{¶ 66} The record supports the juvenile court's findings.  Moreover, as previously noted, the trial court gave consideration to A.W.'s emergence as a potential supporter of D.D.'s bid to regain custody in determining whether PCC was in the best interest of M.D. and A.D.  The juvenile court stated:

> No one from the agency has had the opportunity to view the house.  Testimony is that it is clean, and mother cleans up after herself.
>
> * * *
>
> Aunt, [A.W.], has good intentions.  She is to be applauded for stepping up and helping her sister.  Her lack of any bond with [M.D.] and [A.D.], her lack of knowledge of the complexity of the girls' needs, and the lateness of her request for custody and resulting lack of time for the court and a necessary investigation by FCCS make her an inappropriate custodian at the time of this hearing.

(Sept. 18, 2018 Decision at 17.)

{¶ 67} A juvenile court may allow permissive intervention, pursuant to Civ.R. 24(B), in its discretion.  An order denying a motion to intervene will be reversed only on a showing that the trial court abused its discretion.  *In re J.W.*, 2007-Ohio-1419, at ¶ 26, citing *In re Goff*, 11th Dist. No. 2001-P-0144, 2003-Ohio-6768, ¶ 11.  The term abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable.  *In re J.W.* at ¶ 26, citing *In re Wright*, 10th Dist. No. 04AP-435, 2004-Ohio-4045, ¶ 18, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 68} On this record, we find the juvenile court acted reasonably when it prohibited A.W.'s eleventh hour entry into this child custody case that had been ongoing for several years.[2]  Thus, to the extent A.W.'s proposed intervention in this action impacted D.D.'s parental rights, the juvenile court considered A.W.'s evidence in ruling on the motion for PCC.  *See In re J.P.*, 2019-Ohio-1619, at ¶ 27 (the possibility that a relative could provide a

---

[2]R.C. 2151.414(A)(2) directs the juvenile court to resolve permanent custody cases within 200 days.

permanent placement for a child by assuming legal custody is relevant to the consideration of the R.C. 2151.414(D)(1)(d) best-interest factor).

{¶ 69} For the foregoing reasons, D.D.'s second assignment of error is overruled.

## IV.  CONCLUSION

{¶ 70} Having overruled D.D.'s two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

BRUNNER and BEATTY BLUNT, JJ., concur.

_____