[Cite as *In re D.N.*, 2020-Ohio-5092.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| D.N. et al., | : | |
| (K.C., | : | No. 19AP-755<br>(C.P.C. No. 17JU-13991) |
| Appellant). | : | (REGULAR CALENDAR) |

D E C I S I O N

Rendered on October 29, 2020

**On brief:** *Sybert Road Lackey and Swisher*, and *Zachary M. Swisher*, for appellant K.C.

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

NELSON, J.

{¶ 1} Mother K.C. appeals from the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting the motion for permanent custody of her sons, D.N and D.N., as filed by Franklin County Children Services. Finding no reversible error, we affirm.

{¶ 2} On April 29, 2017, Mother K.C. and Father D.N. each were charged with two counts of endangering children under R.C. 2929.22(A). The charges identified as the victims their minor children, then five-month-old D.N. and two-year-old D.N. FCCS Ex. 1, Complaints & FCCS Ex. 2, Complaints. All counts alleged that each parent had allowed the children "to reside in a drug trafficking house, with syringes laying [sic] in the open, little to no food for [the] children, open access to [the] children by other drug abusers," and that each parent had been "admittedly a heroin, crack abuser * * * for [the] past six months."

*See id.* Each parent entered a plea of guilty to one of the counts in exchange for dismissal of the second count. FCCS Ex. 1, June 26, 2017 Sentencing Entry, and FCCS Ex. 2, May 9, 2017 Sentencing Entry. K.C. received a sentence of 180 days, with credit for 13 days for time served and the remaining term suspended. Father D.N. also received a sentence of 180 days, with credit for 11 days and the remainder suspended. Both sentences included two years of community control.

{¶ 3} On November 11, 2017, FCCS filed a complaint alleging that both children were abused, neglected, and dependent. After a hearing held on January 19, 2018, a magistrate found that "the facts as alleged in the complaint [were] uncontested"; the magistrate adjudicated both children abused under R.C. 2151.031(B), neglected under 2151.03(A)(2), and dependent under 2151.04(C). January 23, 2018 Decision. The trial court granted temporary custody to FCCS under R.C. 2151.353(A)(2) and adopted the agency's case plan as an order of the court. *Id.*

{¶ 4} On May 4, 2018, FCCS filed its motion for permanent custody under R.C. 2151.413. The motion was amended and refiled on October 30, 2018. Neither parent appeared at trial. *See, e.g.,* July 11, 2019 Tr. at 4-5. K.C.'s lawyer had not been able to contact her since January 4, 2019, despite having sent numerous letters and "made several phones calls that she did not answer." *Id.* at 7.

{¶ 5} Rachel Marcum, an FCCS caseworker, testified that she had been assigned to the case on June 16, 2017. *Id.* at 13. By the time of trial, the children were two and four years old and had been in a foster home for over two years. *Id.* at 20-21. Ms. Marcum had formulated the case plan for reunification and had reviewed it "five times" with K.C. and "[a]bout ten times" with father D.N. *Id.* at 20, 24-26. She testified that the case plan required K.C. to "complete a mental health and an alcohol and drug assessment and follow through with recommendations from the assessments, complete parenting classes, complete random urine screens, meet with linked providers and actively participate, sign releases of information for open communication between collaterals, keep [FCCS] updated with her address and maintain appointments with [FCCS] and obtain and maintain stable housing." *Id.* at 28. The case plan also included "a visitation plan" with the children. *Id.*

{¶ 6} According to Ms. Marcum, K.C. completed a drug and alcohol assessment in November of 2018. *Id.* at 31. That assessment resulted in K.C. receiving a referral "for

intensive outpatient therapy three times a week, group sessions in addition to three times a week, individual sessions with a therapist, and continue[d] NA or AA meetings." *Id.* Ms. Marcum averred that K.C. had not provided "any documentation that she completed the recommended treatment" or attended the NA or AA meetings. *Id.* at 34. Ms. Marcum spoke with K.C. "five times" about missed drug testing appointments, and twice gave her bus passes to assist with transportation. *Id.* at 36, 37. She also gave K.C. information on parenting classes, and K.C. provided her with "proof that she attended and completed a parenting class" in February 2019. *Id.* at 39.

{¶ 7}   Ms. Marcum was aware of three different places where K.C. had resided during the pendency of the case. *Id.* at 40. Ms. Marcum's last successful attempt at visiting K.C. before testifying on July 11, 2019 had been on February 26, 2019. Ms. Marcum stated that she had "some concerns" about K.C.'s residence, which had "a very strong stench" that was "not a pet smell. I would be concerned with the sanitation [conditions] of the home. Additionally, the bedrooms [for the children were] full of stuff," such as "[f]urniture [and] boxes." *Id.* at 53. Subsequent attempts at reaching K.C. by "calling her over the phone" were not successful because K.C. did not return calls; nor was Ms. Marcum able to "personally complete three unannounced visits to her home per month," as no one would answer the door. *Id.* at 42-44.

{¶ 8}   Ms. Marcum testified that the first visitation with the boys after the children came into FCCS custody in June of 2017, K.C.'s was not until October of 2018—more than a year later. "Her visits were then suspended in April [2019]. Her last visit with the boys was March 31st of 2019." *Id.* at 46-47. K.C. did not visit with the children between then and Ms. Marcum's July 11, 2019 testimony. *Id.* at 47.

{¶ 9}   Ms. Marcum described the children as "both very bonded with [the] foster parents." *Id.* at 48. The children seek the foster parents "for comfort when they're hurt or need help with something or they're hungry." *Id.* at 48-49. She agreed that "the current foster home is a prospective adoptive home" for the boys, and she recommended that the court grant the motion for permanent custody. *Id.* at 49.

{¶ 10}  Jessika Gualtieri testified that she was appointed as the children's guardian ad litem in July of 2017. *Id.* at 74. She described the interaction between K.C. and the

children as "friendly and positive," although "the younger child was a little less engaged" and did not appear to understand that K.C. was his mother. *Id.* at 77.

{¶ 11} Ms. Gualtieri also described visits between father D.N. and the children as "positive and friendly. He was very physically engaged with them." *Id.* at 78. She described the children's interaction with the foster parents as "very positive. They are very warm; very nurturing. They're very appropriate with redirection." *Id.* When asked to describe the "difference" between the children's interaction with their biological parents and their interaction with the foster parents, Ms. Gualtieri stated that "there is a friendly relationship with their parents, but it's not the kind of bond that they have with their foster parents. * * * [T]hat's their home, that's their comfort; that's where they feel safe and secure." *Id.* at 79. In Ms. Gualtieri's opinion, the children were not competent to understand the permanent custody proceedings or to express their wishes. *Id.* at 80. She recommended granting the motion for permanent custody. *Id.*

{¶ 12} The trial court continued the proceedings so that the guardian ad litem could further observe the children and allow the parents to "request and attend visitations" if they desired. *Id.* at 89. Again at the subsequent proceeding, neither K.C. nor father D.N. appeared. September 17, 2019 Tr. at 5. Father D.N.'s lawyer informed the trial court that he was no longer "opposing the PCC of his children and therefore [the motion was] now uncontested" by him. *Id.*

{¶ 13} Ms. Gualtieri testified again and stated that she had spoken with the children about "their wishes," but that "it was extremely difficult" because "they don't understand" the situation or "living somewhere else." *Id.* at 9. The younger child "was not able to communicate very well with [her]," and the older child was "very happy where he is and wants to spend the night there, to continue to spend the night there." *Id.* at 10. She was concerned that asking the older boy "where he wants to live might cause him additional insecurity because he's very happy where he is." *Id.* at 10-11. Although the trial court had intended to question the children in camera regarding their wishes, it accepted Ms. Gualtieri's recommendation against such an interview because "not only would it be fruitless, [but] might be harmful." *Id.* at 11. The trial court noted that "the foster parent attempted to bring [the older boy] in for the interview and he was crying and appeared to be visibly upset." *Id.* at 14. Ms. Gualtieri maintained her recommendation in favor of

granting the motion for permanent custody. *Id.* at 16. She also stated that she had "reached out" to K.C., but that K.C. did not respond to any of her text messages. *Id.* at 16-17.

{¶ 14} On October 4, 2019, the trial court entered judgment granting the motion, committing both children to the permanent custody of FCCS, and divesting K.C. and father D.N. of their parental rights. Judgment Entry at 16.

{¶ 15} K.C. has appealed and asserts one assignment of error:

> The trial court committed reversible error by terminating the appellant-mother's parental rights when the court failed to properly analyze the factors in R.C. 2151.414(D) and the decision was against the manifest weight of the evidence.

{¶ 16} "A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 13, citing *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312. The reviewing court "must make every reasonable presumption in favor of the judgment and the trial court's findings of facts." *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 13.

{¶ 17} R.C. 2151.414 governs resolution of an agency's motion for permanent custody. "Before granting permanent custody, a trial court must make two determinations by clear and convincing evidence." *In re C.W.*, 10th Dist. No. 19AP-309, 2020-Ohio-1248, ¶ 54. First, the trial court must determine whether one of the five factors under R.C. 2151.414(B)(1) applies. Here, the trial court concluded that "[c]lear and convincing evidence established" that "[t]he Parents have abandoned the Children" under R.C. 2151.414(B)(1)(b), and, "[a]dditionally," under R.C. 2151.414(B)(1)(a), that "the Children [could not] be placed with either of the Parents within a reasonable period of time or should not be placed with the Parents for the reasons set forth in R.C. 2151.414(E)(1), (2), (4), (6), and (10)." Judgment Entry at 13. Here, those reasons were that "the Parents [had] failed continuously and repeatedly to substantially remedy the conditions causing the Children to be placed outside their home"; the parents had not complied with case plan requirements to "participate in AOD counseling, attend AA/NA meetings" to address their drug abuse that had "resulted in Child Endangerment"; the parents "lack[ed] commitment toward the Children," as demonstrated "by failing to regularly visit or communicate with the Children"; the children had been victims of the parents' convictions for child endangerment under R.C.

2919.22(A); and "[t]he Mother and Father abandoned the Children." *Id.* at 13-14. K.C.'s appeal does not contest these findings of the trial court on appeal.

{¶ 18} Rather, her appeal challenges the second part of the R.C. 2151.414(B)(1) analysis, which requires that the trial court determine "by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody." This determination requires consideration of various "relevant factors" under R.C. 2151.414(D)(1), to the extent applicable: "(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *; (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and] (e) Whether any of the factors in divisions (E)(7) to (11) of [R.C. 2151.414] apply in relation to the parents and child."

{¶ 19} K.C. argues that "[t]he Court's flawed analysis of the best interest factors resulted in a PCC ruling that was against the manifest weight of the evidence." Appellant's Brief at 19. She first criticizes the trial court's findings under R.C. 2151.414(D)(1)(a) concerning "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." We disagree with her characterization of the trial court's findings as "discount[ing] the narrow difference between the relationship between the foster parents and the Children as opposed to the relationship between Appellant and her children." Appellant's Brief at 19. The trial court stated that "[t]he [guardian ad litem] opined that the parent/child and the foster parent/child interactions differed in that the interactions between the Children and Parents were friendly but did not evidence a bond, while the interactions between the Children and foster parents evidenced a significant bond." Judgment Entry at 14. The trial court acknowledged that "the visitation between

Mother and the Children was friendly and positive," but emphasized the more substantial bond between the children and the foster parents in its assessment of the "interaction and interrelationships" of all parties under R.C. 2151.414(D)(1)(a).

{¶ 20} K.C. argues that the children's bond with the foster parents was stronger than hers "due to the sheer amount of time" that the children have been with the foster parents, and that this placement occurred not only because of her own "actions" but because "the financial issues of the other family members" made them unable to serve as foster parents: "Appellant and her family are poor and for this she may lose her children." Appellant's Brief at 20. But appellant's financial status played no part in the trial court's assessment of the "interaction and interrelationships" of the children with their parents or foster parents under R.C. 2151.414(D)(1)(a). The trial court noted that the "maternal grandmother withdrew her motion for custody," that the "[p]aternal grandmother had a criminal record concerning to the Agency," and that no friends had applied (citing financial constraints). Judgment Entry at 13. The manifest weight of the evidence supported the trial court's assessment of the bond between the children and their foster parents, and the lack of a similar bond between the children and K.C. and father D.N. Speculation about hypothetical circumstances does not undermine the trial court's finding regarding the bonds between the children and the foster parents.

{¶ 21} K.C. also faults the trial court's findings under R.C. 2151.414(D)(1)(b) concerning "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." She believes that the trial court "essentially made no findings on this factor other than the fact that the Children were not competent to testify and the [guardian ad litem] had a belief that the Children did not understand the concept of living somewhere other than with the foster family." Appellant's Brief at 20. She also faults the trial court for "not interview[ing] the Children in camera over the objection of Appellant's trial counsel." *Id.*

{¶ 22} We find no error in the trial court's reliance on the testimony of the guardian ad litem. "The juvenile court properly considers the GAL's recommendation on the permanent-custody motion as part of the R.C. 2151.414(D)(1)(b) analysis where the children are too young to express their wishes." *In re B/K Children*, 1st Dist. No. C-190681, 2020-Ohio-1095, ¶ 45, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 60.

The trial court relied on the guardian ad litem's assessment that "the Children were not competent to express their wishes and did not understand the concept of permanent custody or of 'living somewhere else' other than in their foster home." Judgment Entry at 14. In addition, the trial court had "due regard for the maturity of the child[ren]" when it decided, on the recommendation of the guardian ad litem and its own observation of the older boy "clinging on to his foster mother" and "crying" as "he appeared to be frightened by the setting," not "to attempt an in camera interview [of] either of the Children so as to avoid the risk of traumatizing the Children." Judgment Entry at 7. The trial court also continued the initial proceedings and instructed the guardian ad litem to perform additional observation concerning the children's wishes "and to file an updated report," evidencing an intent that the guardian ad litem have more information before testifying about her recommendation. *Id.* at 7. Under the circumstances of this case, the trial court did not misuse the guardian ad litem's testimony. *See, e.g., In re K.J.,* 10th Dist. No. 19AP-727, 2020-Ohio-4391, ¶ 20 ("Because K.J. 'was not able to comprehend the situation nor able to express her wishes,' the trial court properly relied on K.J.'s guardian ad litem in making its findings under R.C. 2151.414(D)(1)(b)").

{¶ 23} K.C. also faults the trial court's finding under R.C. 2151.414(D)(1)(c), which concerns "[t]he custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *." In discussing this factor, the trial court merely stated that the children "have lived in their foster home since June 6, 2017." Judgment Entry at 14. Although this statement is cursory, K.C. does not argue that it is inaccurate. She asserts that if the trial court had "fully reviewed the custodial history, the court would have weighed this factor in favor of the Appellant." Appellant's Brief at 22. But she cites no portion of the record where the children's custodial history with her weighs in her favor. Without belaboring that history, *see supra* at ¶ 2, we merely note that it does not.

{¶ 24} In addressing "[t]he child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency," as required by R.C. 2151.414(D)(1)(d), the trial court stated: "The GAL opined that [the older child] is very insecure. The Court concludes that adoption may provide [him] a

greater sense of security[,] and uprooting the Children from the only home they remember would likely have a negative effect on the Children. Both the Caseworker and the GAL recommended that the motion for permanent custody be granted. The foster parents are open to adoption of [the children] should they be given the opportunity to adopt."

{¶ 25} K.C. argues that the trial court's analysis is erroneous because it "goes no further" than mentioning the recommendations of the guardian ad litem and the caseworker, and does "not address at all the adequacy of the mother's home." Appellant's Brief at 23. But the trial court emphasized the enhanced sense of security that placement and eventual adoption could provide. And the trial court made numerous findings concerning both parents' failure to comply with the case plan requirements. *See* Judgment Entry at 11-12. By contrast, the record does not reflect that legally secure placement could be achieved without a grant of permanent custody to FCCS.

{¶ 26} Finally, K.C. argues that the trial court's analysis under R.C. 2151.414(D)(1)(e) was flawed. The statute asks the trial court to consider "[w]hether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." The trial court stated: "No evidence was offered as to the best interest factors listed in divisions (E)(7) to (11) of R.C. 2151.414." Judgment Entry at 14.

{¶ 27} R.C. 2151.414(D)(1) recites that "the court shall consider all relevant factors, including * * * [w]hether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." "Due to the nature of the factors set forth in R.C. 2151.414(E)(7) to (11), they will not apply in every case." *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 32. We have "previously affirmed decisions holding an award of permanent custody to an agency to be in a child's best interest without explicit consideration of those factors where they did not apply, or decisions where the juvenile court only considered certain of the R.C. 2151.414(E)(7) to (11) factors that were applicable to the particular case." *Id.* (citations omitted). K.C. does not point to any applicable factors that went unaddressed by the trial court. We do note that the trial court elsewhere made a finding under R.C. 2151.414(E)(10) that the parents had abandoned the children. Judgment Entry at 14. But the trial court's omission of a finding of abandonment of the children from this portion of the best interest analysis in no way prejudiced K.C. We find

no error in the trial court's weighing of the evidence under R.C. 2151.414(D)(1) in determining the best interest of the children.

{¶ 28} We overrule the sole assignment of error and affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

KLATT and DORRIAN, JJ., concur.

_____