[Cite as *In re K.J.*, 2020-Ohio-4391.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| | | No. 19AP-727 |
| K.J., | : | (C.P.C. No. 17JU-11250) |
| (T.J., | : | (REGULAR CALENDAR) |
| Appellant). | : | |

---

D E C I S I O N

Rendered on September 10, 2020

---

**On brief:** *John T. Ryerson*, for appellant.

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

NELSON, J.

{¶ 1} The trial court's decision in this permanent custody case may provide some ground for hope for all concerned with what has been an enormously difficult situation. The trial court's ruling could clear the way for adoption of K.J., who was almost four at the time of the hearing, by her current foster mother (who wants that result). And the foster mother has said that she is inclined to facilitate ongoing contact between K.J. and her biological mother T.J., who herself was only going on 17 when the hearing was conducted. T.J. wants her daughter but told the trial court that, "[i]f you decide [under the circumstances] to give her to whomever else, all I ask is that I still get to be in contact with her so she can see how much I have grown." Aug. 15, 2019 Tr. at 201.

{¶ 2} K.J.'s putative father is not in the picture; the evidence is that he remains in prison for raping T.J. when she was 12. It is to T.J.'s great credit that she wants to be reunited with K.J.; she does not challenge, however, any of the trial court's specific findings

indicating that by clear and convincing evidence, a grant of permanent custody to the County is in K.J.'s best interest. Because we discern no error in the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch that granted the motion of Franklin County Children Services for permanent custody of K.J. and from which T.J. appeals, we will affirm that judgment.

{¶ 3} T.J. was thirteen when she gave birth to K.J. on November 2, 2015. Birth Certificate of K.J., Tr. Ex. 4. The trial court's thorough decision recounts the history of this matter, but we note that Teyana Jones, a former FCCS caseworker, became involved with T.J.'s own case, involving T.J., her mother, and her brother, in April of 2016. Aug. 14, 2019 Tr. at 13-14. FCCS had opened that case earlier based on a complaint that T.J.'s brother had sexually abused her. *Id.* The investigation resulted in "multiple substantiated" incidents of T.J. suffering sexual abuse by her own father and by K.A., K.J.'s father, and "indicated" sexual abuse by the brother as well. *Id.* at 15-16; Ex. 6.

{¶ 4} When Ms. Jones was assigned to the case, she discovered that T.J.'s mother had allowed T.J.'s brother to live at home again in violation of the safety plan to which FCCS and T.J.'s mother had agreed. *Id.* at 19-20. According to Ms. Jones, T.J. "stated that she did not feel safe" at home "because her mother did not believe her that the sexual abuse [had] occurred," that "the sexual abuse with [her brother] caused her to want to harm herself," and that she was "having suicidal ideations and self-harming." *Id.* at 17, 20-21.

{¶ 5} T.J. and K.J. were placed together in a foster home on April 20, 2016. *Id.* at 23. Five weeks later, T.J. attempted suicide. *Id.* at 24. Several weeks after that, she began self-harming with razor blades. *Id.* at 25-26. T.J. was admitted to the hospital for several days. *Id.* at 28. The foster mother at that point requested that T.J. and K.J. be placed in a different home. *Id.* at 29.

{¶ 6} On August 19, 2016, Ms. Jones received a report that T.J. had cut herself 12 times with razor blades in her new foster home. *Id.* Ms. Jones also testified that T.J. admitted that "she bit [K.J.] because she gets annoyed easily and [K.J.] annoyed her." *Id.* at 34; *see also* Aug. 15, 2019 Tr. at 177-78 (T.J. testifies that while the bite did not draw blood, she did not know what she was doing). In late May of 2017, T.J. again cut herself multiple times, subsequently threatened suicide, and was placed in an inpatient treatment program at Nationwide Children's Hospital. Aug. 14, 2019 Tr. at 36, 38, 42-43.

{¶ 7} Ms. Jones testified that while T.J. and K.J. were in foster care, "the foster parents were [the] primary caregiver[s] of [K.J.] due to some safety concerns with [T.J.]'s interactions" with her child. *Id.* at 47-48. T.J. "referred to [K.J.] more of like a sister" than her daughter. *Id.* at 96. Ms. Jones referred T.J. to a number of parenting programs "to help her interact" appropriately with and care for K.J. *Id.* at 48-50. Ms. Jones also referred T.J. to youth programs, as well as to counseling and psychiatric services. *Id.* at 51.

{¶ 8} After her discharge from Nationwide Children's Hospital, T.J. was placed in a new foster home on August 4, 2017. *Id.* at 129. K.J. remained at the previous home; a dependency complaint had been filed and the trial court had granted temporary custody of K.J. to FCCS on June 23, 2017. *See* Sept. 24, 2019 Judgment Entry at 8. T.J. remained at her third foster home until October 26, 2017, when she was placed in another home. *Id.* at 9.

{¶ 9} On November 9, 2017, the trial court adjudicated K.J. to be a dependent child, committed her to the temporary custody of FCCS, and adopted the agency's case plan. *Id.* at 9-10. The next day, K.J. was placed in T.J.'s foster home, as "[i]t was hoped that with the intervention of [T.J.]'s therapist and with parent mentoring, Mother and Child could be together in the same foster home." *Id.* at 10. K.J. remained in that foster home through the date of trial. Tr. at 134-35. Reunification was hoped for, with T.J. designated to be "the primary care giver (bathing, grooming, clothing, feeding, and comforting) for her daughter. This plan was not successful." Sept. 24, 2019 Judgment Entry at 10. At various times, T.J. refused K.J.'s "requests for holding and instead * * * hid in the bedroom." *Id.* T.J. did not heed K.J.'s cries to stop "tickling and roughhouse" play. *Id.* The foster mother "modeled parenting" for T.J. with her own child, and T.J. "had the additional help of a parenting mentor" and ongoing therapy; nevertheless, after complaining that "she had no privacy," K.J. started sleeping in the foster mother's bedroom. *Id.* T.J. candidly acknowledges that she was not ready for a parenting role at that stage. Aug. 15, 2019 Tr. at 192.

{¶ 10} T.J. engaged in self-harm again in March of 2018. In June of 2018, she injured herself again and expressed suicidal intentions, resulting in another inpatient hospitalization followed by placement into a "secured, self-contained residential treatment facility in Cleveland to stabilize her mental health." *See* Sept. 24, 2019 Judgment Entry at 10-11. From then until the date of trial, August 15, 2019, T.J. was either hospitalized or in

long-term residential treatment due to repeated incidents of self-harm and suicide attempts. *See id.* at 11-13. From April 30, 2019 through the end of the permanent custody hearing, she was in a residential treatment facility in Washington Court House, Ohio, *id.* at 13, from which she had not been given a notice of planned discharge as of the time of her testimony, Aug. 15, 2019 Tr. at 165.

{¶ 11} The trial court extended FCCS's temporary custody of K.J. on July 9, 2018. FCCS filed its motion for permanent custody of K.J on November 15, 2018.

{¶ 12} T.J. had a number of supervised visits with K.J. between May and August of 2019. *See id.* at 13-15. The first visit made the social worker observing "uncomfortable," due to "boundary issues, [including] the rough play, [T.J.] not recognizing cues from [K.J.]." *Id.* at 14. The two "were bonded like siblings" rather than as mother and daughter. *Id.* Subsequent visits in July and August were more successful; "parent/child comfort level" and "interaction with all parties" were described as "good." *Id.* at 15.

{¶ 13} The trial court held an evidentiary hearing on the motion for permanent custody on August 14 and 15, 2019. On September 24, 2019, the trial court granted the motion, committing K.J. to the permanent custody of FCCS and divesting T.J. of her parental rights. Judgment Entry at 12.

{¶ 14} T.J. appeals and asserts the following assignments of error:

> 1. The Court below erred in finding that the granting of permanent custody of K.J. to Franklin County Children Services was in the best interest of K.J.
>
> 2. The Court below erred in finding that Franklin County Children Services made reasonable efforts to reunify K.J. with her minor mother T.J.
>
> 3. The Court below erred in finding that K.J. could not be [re]unified with her minor mother within a reasonable amount of time.
>
> 4. The Court erred in failing to find that minor mother T.J. should have additional time to reunify with her daughter K.J. because she was a minor and in the custody of Franklin County Children Services.

{¶ 15} R.C. 2151.414 governs the determination of an agency's motion for permanent custody of a child. "Before granting permanent custody, a trial court must make two determinations by clear and convincing evidence." *In re C.W.*, 10th Dist. 19AP-309, 2020-Ohio-1248, ¶ 54. First, the trial court must determine whether one of the five factors under R.C. 2151.414(B)(1) applies. In this case, the trial court concluded that R.C. 2151.414(B)(1)(d) applied, which states: "The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period." The trial court found that K.J. "was in the continuous custody of [FCCS] for purposes of R.C. 2151.414(B)(1)(d), from November 9, 2017 to the date of the November 15, 2018 filing of the motions for permanent custody, a period of over 12 months." Sept. 24, 2019 Judgment Entry at 19. T.J. does not contest that finding.

{¶ 16} Second, the trial court then must determine whether "by clear and convincing evidence, * * * it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody." R.C. 2151.414(B)(1). This determination requires consideration of any of the following "relevant factors" under R.C. 2151.414(D)(1): "(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *; (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; (e) Whether any of the factors in divisions (E)(7) to (11) of [R.C. 2151.414] apply in relation to the parents and child."

{¶ 17} Where procedures have been followed in accordance with statue, "[a] trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 13, citing *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312. The

reviewing court "must make every reasonable presumption in favor of the judgment and the trial court's findings of facts." *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 13. "In determining whether the trial court's ruling on the permanent custody motion is against the manifest weight of the evidence, we must consider whether the evidence on each element of the agency's case satisfied or failed to satisfy the burden of persuasion, i.e., whether clear and convincing evidence supports each element." *In re T.M.*, 10th Dist. No. 18AP-943, 2020-Ohio-815, ¶ 8 (citations omitted); *In re I.H.*, 10th Dist. No. 16AP-463, 2017-Ohio-815, ¶ 8 (citations omitted). "Clear and convincing evidence is that measure or degree of proof which is more than a mere preponderance of the evidence, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases, and that will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re I.H.* at ¶ 7.

{¶ **18**} In T.J.'s first assignment of error, she argues that the trial court erred by determining that granting permanent custody of K.J. to FCCS was in the child's best interest. But the arguments she presents do not relate directly to the child's best interests: Her briefing does not address or challenge any of the trial court's findings under R.C. 2151.414(D)(1)(a) through (e). Given the nature of the case, we nevertheless review the trial court's assessment, which we find is not against the manifest weight of the evidence.

{¶ **19**} With regard to the "interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers" under R.C. 2151.414(D)(1)(a), the trial court credited caseworker Ms. Brown's observation during an April 2019 visit that K.J. " 'was excited to see' " T.J. but reacted in a way " 'similar or the same as my reaction to seeing my sister.' " Sept. 24, 2019 Judgment Entry at 20. Ms. Brown characterized the bond between K.J. and her foster mother, on the other hand, as " 'similar to that of mother and child,' " with K.J. apparently comfortable with and seeking comfort from her foster mother. *Id.* The trial court also noted Ms. Brown's observation that K.J. was " 'very excited to see' " her maternal grandmother. *Id.*

{¶ **20**} Because K.J. "was not able to comprehend the situation nor able to express her wishes," the trial court relied on K.J.'s guardian ad litem in making its findings under R.C. 2151.414(D)(1)(b). *Id.* The GAL recommended granting the County's motion. The trial court emphasized the GAL's determination that K.J. had "suffered from the lack of

clarity regarding her permanency, as her maternal figure has changed throughout the course of her life and placements," and noted that K.J. had " 'behavioral issues and regressions that tend[ed] to correlate with visits with Maternal Grandmother or with [T.J.].' " *Id.* at 20-21. The GAL stated that K.J. was at a " 'critical age' " and would benefit from " 'finding permanent placement' " so that she may " 'begin to develop long term bonds.' " *Id.* at 21. According to the GAL, K.J. was " 'very happy where she is.' " *Id.* The GAL also observed that T.J. " 'continues to make progress to[ward] being released but there is no timetable for her release,' " and that she had "struggled" both with her own mental health and balancing "her health with the best interest of [K.J.]." The trial court also emphasized the GAL's assessment that his recommendation would not change even if T.J. "were able to transition to a treatment foster home within the next six months," as T.J. had "struggled even when not having parenting responsibilities." *Id.* The trial court's account of the GAL's testimony is consistent with the record.

{¶ 21} In addressing the "custodial history of the child" under R.C. 2151.414(D)(1)(c), the trial court found that K.J. had been in FCCS's custody from June 23, 2017 until the trial, in the current foster home since November 10, 2017, and had not lived in the same foster home with T.J. since June 28, 2018. *Id.*

{¶ 22} The trial court further addressed the need for a legally secure permanent placement under R.C. 2151.414(D)(1)(d). The trial court noted that K.J.'s current foster mother and prospective adoptive mother "is a research scientist at Nationwide Children's Hospital and a 'treatment foster home' parent." *Id.* She had been concerned about excessive crying (and had asked for K.J.'s removal from her house in early 2019, but then had rescinded that request); K.J. has been diagnosed with Reactive Attachment Disorder and Traumatic Stress Disorder, and was in therapy for both conditions. *Id.* By the time of the hearing, K.J. had been with her foster mother for 22 months, called her "mom," and "wants a hug and a kiss" from her after waking up and after separating and reuniting with her. *Id.* K.J. and her foster mother's four-year old child "interact as siblings." *Id.* K.J.'s foster mother wants to adopt her, the trial court said, and "would probably allow [T.J.] to have continued contact as long as it is positive." *Id.* The trial court noted that K.J.'s foster mother had "acknowledged that it would be harmful if [K.J.] were not allowed contact with [T.J.] and Maternal Grandmother ever again," and that T.J. had expressed that if K.J. were

to be adopted, she would want her foster mother to adopt her. *Id.* In its finding, the trial court also noted that Ms. Brown recommended granting FCCS's motion because of the length of the temporary custody, the need for permanency, T.J.'s "significant mental health issues" that had "not stabilized," her lack of parenting skills, her lack of "a parent/child bond with [K.J.]," and her inability to care for her. *Id.*

{¶ 23} The trial court noted that "[n]o evidence was offered as to the best interest factors listed in divisions (E)(7) to (11) of R.C. 2151.414."

{¶ 24} The trial court concluded that, "having considered the best interest factors of R.C. 2151.414(D)(1), including [K.J.]'s need for security and permanency, the Court finds that granting the motion for permanent custody for the purpose of adoption is in [K.J.]'s best interest." Sept. 24, 2019 Judgment Entry at 22. The trial court also found that "R.C. 2151.414(D)(2) *requires a finding* that termination of parental rights is in the best interest of [K.J.] because all four of the circumstances set forth therein were proven by clear and convincing evidence"; therefore, the "motion for permanent custody of [K.J. was] granted." *Id.* at 22-23 (emphasis in original).

{¶ 25} On this record, we cannot gainsay the trial court's assessment of the evidence, in light of the R.C. 2151.414(D)(1) factors, that granting the motion for permanent custody was in K.J.'s best interest. K.J.'s interactions and interrelationships show a mother-child bond with her foster mother that could meet the need for permanency described by her GAL. Clear and convincing evidence supported all of the trial court's findings under R.C. 2151.414(D)(1)(a) through (e), and, in turn, its best interest determination. T.J.'s briefing does not draw into question any of the trial court's specific best interest findings. We overrule the first assignment of error.

{¶ 26} The second assignment of error posits that FCCS did not engage in reasonable efforts to reunify T.J. with her daughter. T.J. argues that as "a minor in the care of FCCS" herself, "her freedom to move and establish her own home was impossible, until the agency would agree," and that the caseworker "testified that minor mother T.J. had essentially complied with her case plan requirements in the instant case." Appellant's Brief at 12-13.

{¶ 27} Under governing precedent, the question is whether the record reflects either that reasonable efforts findings were made at some point before the permanent custody

determination, or that they were made appropriately as part of that determination: "[T]he state must make reasonable efforts to reunify the family before terminating parental rights. If the agency has not already proven reasonable efforts, it must do so at the hearing on a motion for permanent custody." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 4. In this case, a magistrate already had found that FCCS "made reasonable efforts to finalize a permanency plan" by virtue of its approval of a case plan for K.J. on November 15, 2017, six days after receiving temporary custody of the minor. Dec. 18, 2018 Findings of Fact and Conclusions of Law.

{¶ 28} T.J. argues that "this entry is merely a cursory document submitted by the agency routinely," and it was "filed eight months prior to the trial dates"; thus, her "position about 'reasonable efforts' made in her case toward reunification with her daughter had shifted." Appellant's Brief at 14. That position is not consistent with *In re CF* or with our own case law. *See, e.g., In re J.C.*, 10th Dist. No. 10AP-766, 2011-Ohio-715, ¶ 21-22 (previous "reasonable efforts" finding by magistrate meant that the issue did not need to be addressed at the permanent custody hearing). But here, moreover, just as recited in paragraph 22 of *In re J.C.*, "although not required, the judge also made a finding of 'reasonable efforts' at the permanent custody hearing." *See* Judgment Entry at 23 ("Franklin County Children Services has made reasonable efforts to prevent the removal of the Child from the Child's home, eliminate the continued removal of the Child from the Child's home, and safely return the Child to the Child's home; and * * * has made reasonable efforts to finalize the permanency plan in effect for the Child").

{¶ 29} The trial court extensively addressed T.J.'s compliance (or lack thereof) with the case plan, when making additional rulings under R.C. 2151.414(B). *See* Sept. 24, 2019 Judgment Entry at 16-18, 22. The GAL had acknowledged T.J.'s "progress," *id.* at 21, as does the County, *see* Appellee's Brief at 31, and T.J. has done well at school and hopes to go on to college, *see* Judgment Entry at 10 and Aug. 15, 2019 Tr. at 159; this progress, however, did not alter the GAL's recommendation for the grant of permanent custody to the County, and as of the end of trial, there was no current plan for T.J.'s discharge from the Washington Court House facility into transitional housing or another foster home of her own, *see* Aug. 15, 2019 Tr. at 193, 208. The evidence supports the trial court's conclusion that "in spite of the intense and appropriate treatment provided to the [then] 16-year-old mother,

[T.J.], due to the seriousness of her trauma, the fragility of her mental health, and her AWOL [from a treatment facility], was unable to complete residential treatment [by the time of hearing]. Her latest suicide attempt was April 12, 2019, just four months prior to trial. It may be months or years before Mother is mentally able [to] meet the challenges of parenting [K.J.]." Judgment Entry at 17. Likewise, the trial court's conclusion that "Parents were either unable or unwilling to complete essential components of the reunification case plan," *id.* at 19, is grounded in the record. We overrule T.J.'s second assignment of error.

{¶ 30} Under her third assignment of error, T.J. argues that the trial court should have given her more time to reunify with K.J. because she herself is a minor. She emphasizes that she is not challenging the permanent custody statute on constitutional grounds, and that the only statutory basis for her argument is the "catchall" factor under R.C. 2151.414(E)(16) that allows "[a]ny other factor the court considers relevant" to be assessed in determining whether a child can be placed with either parent within a reasonable amount of time: "Appellant submits that her status as a minor alone should trigger this analysis." Appellant's Brief at 18.

{¶ 31} Because T.J. does not challenge the finding that K.J. had been in the custody of FCCS for 12 or more months of the consecutive 22-month period, and because the trial court was justified in concluding that permanent placement with the County was in her best interest, this assignment of error is moot. "When a child has been in the temporary custody of FCCS for 12 or more months in a consecutive 22-month period, the court need not find that the child cannot or should not be placed with either parent within a reasonable time." *In re D.G.*, 10th Dist. No. 09AP-1122, 2010-Ohio-2370, ¶ 11, citing *In re Williams*, 10th Dist. No. 02AP-924, 2002-Ohio-7205, ¶ 46. "Thus, when considering an award of permanent custody, pursuant to R.C. 2151.414(B)(1)(d), 'the only other consideration becomes the best interests of the child.' " *In re D.G.* at ¶ 11, quoting *In re Williams* at ¶ 47.

{¶ 32} Moreover, mootness aside, the "public policy" arguments from which T.J. argues that the parental rights of a minor *never* should be terminated, no matter what the circumstances and best interest of the (younger) child, *see, e.g.,* Appellant's Brief at 16, find no support in the legislative language that the General Assembly actually used in establishing public policy in this realm. Contrary to the suggestion of her brief, *see id.* (invoking R.C. 2305.16 regarding the tolling of certain actions), this matter does not involve

a cause of action in contract or a real estate transaction, but concerns a living, growing child whose GAL said she " 'would benefit from finding a permanent placement, as she is at a critical age and it would benefit her to begin to develop long term bonds with whomever she will be placed [for] the long term.' "  Judgment Entry at 21.  *Compare* R.C. 2151.415(D)(4) ("No court shall grant an agency more than two extensions of temporary custody pursuant to division (D) of this section and the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered pursuant to division (D) of this section").

{¶ 33}  We overrule T.J.'s third assignment of error.

{¶ 34}  T.J.'s fourth assignment of error is related to her third and is moot for the same reason.  Under this assignment, T.J. reiterates her argument that the trial court "erred in implicitly finding that K.J. could not be reunited with her Mother T.J. within a reasonable amount of time."  Appellant's Brief at 19.  She premises that contention on a view that she "was about to be released to foster care within a brief, reasonable amount of time (about 30 days) where it would have been possible to place minor mother and her child together."  *Id.* at 19-20.

{¶ 35} In addition to its finding under R.C. 2151.414(B)(1)(d) that K.J. was in temporary custody for 12 or more months of a consecutive 22-month period—which, again, obviated any need of a further finding before moving on to the best interest analysis—the trial court did make an additional finding under R.C. 2151.414(B)(1)(a) that K.J. could not be placed with either parent.  Sept. 24, 2019 Judgment Entry at 19.  The trial court noted that "Alleged Father * * * is not scheduled to be released from prison until 2045."  *Id.*  And T.J. in the past had been "unable or unwilling" to care for K.J.'s basic needs, the trial court found:  She "may need months or years of treatment before she is able to safely parent a child," and because of her "chronic emotional illness the severity of which requires residential treatment," T.J. cannot live with her daughter "at the present time."  *Id.* at 19-20 (applying R.C. 2151.414(E) factors).  Even if the issue is not moot, these findings, too, are not against the manifest weight of the evidence.  *See also, e.g., id.* at 21 (noting GAL's testimony that "there is no timetable for [T.J.'s release]" and that he would not recommend

against County's motion for permanent custody even were T.J. herself "able to transition to a treatment foster home within the next six months"); Aug. 15, 2019 Tr. at 165 (T.J. testifies that she has not received notice that she will be able to move within 30 days).

{¶ 36} We overrule T.J.'s fourth assignment of error.

{¶ 37} The trial court underscored that "while [T.J.], herself a minor and the victim of great trauma, is owed great sympathy and the protection of the community, the focus of 'best interest' must be upon [K.J.], * * * as required by R.C. 2151.414(C)." Judgment Entry at 22 (emphasis omitted; citing statutory provision that "a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child"). The trial court's conclusion that "granting the motion for permanent custody is in the best interest of [K.J.]," *id.* (emphasis omitted), was not against the manifest weight of the evidence. Having overruled T.J.'s four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

LUPER SCHUSTER and BEATTY BLUNT, JJ., concur.

_____