[Cite as *In re S.C.*, 2022-Ohio-356.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| [S.C. et al., | : | No. 21AP-203 |
| | | (C.P.C. No. 18JU-9361) |
| S.B., | : | |
| | | (REGULAR CALENDAR) |
| Appellant]. | : | |
| In the Matter of: | : | |
| | | No. 21AP-204 |
| [M.M., | : | (C.P.C. No. 18JU-9344) |
| S.B., | : | |
| | | (REGULAR CALENDAR) |
| Appellant]. | : | |

---

D E C I S I O N

Rendered on February 8, 2022

---

**On brief**: *William T. Cramer*, for appellant.

**On brief**: *Steven Thomas D. Potts*, for appellee Franklin County Children Services.

---

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

NELSON, J.

{¶ 1} In these consolidated cases, mother S.B. appeals from the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, that granted motions of appellee Franklin County Children Services ("FCCS," or "the agency") for permanent custody of S.B.'s three minor children.

{¶ 2} On July 23, 2020, FCCS filed a motion (in common pleas case No. 18JU-9344) for permanent custody of M.M., then age ten. On August 3, 2020, FCCS filed a

motion (in common pleas case No. 18JU-9361) for permanent custody of S.C., then age seven, and J.C., then age five. S.B. is the mother of all three children. B.M. is the putative father of M.M., and J.H.C. is the father of S.C. and the putative father of J.C. The juvenile court granted the motions for permanent custody by Judgment Entry of April 5, 2021.

{¶ 3} As S.B. recites in her brief, "the agency first became involved with this family based on an allegation of medical neglect after mother tested positive for drugs at M.M.'s birth. However, the case was closed because the family could not be located." Appellant's Brief at 1, citing Jan. 28, 2021 Tr. at 29-30. M.M. was born October 23, 2009, and B.M. "is alleged to be [his] father * * * but paternity had never been established." Judgment Entry at 7.

{¶ 4} S.C. was born to S.B. and J.H.C. on June 4, 2013. At the time of birth, the infant S.C. "tested positive for an illicit drug." *Id.* at 8. In 2013, the juvenile court granted FCCS temporary orders of custody as to both M.M. and S.C. J.C. was born October 17, 2014. *Id.* at 8. S.C.'s father J.H.C. "is alleged to be the father of [J.C.] but paternity has not been established." *Id.*

{¶ 5} In May 2015, after having been in FCCS's temporary custody for over 18 months, M.M. and S.C. "were returned to the custody of Mother with protective supervision by the Agency." *Id.* In June 2016, FCCS terminated protective supervision of M.M. and S.C., and "the prior cases were closed." *Id.*

{¶ 6} On May 31, 2018, however, the juvenile court granted FCCS "temporary orders of custody" with respect to all three children after reports of parental drug use, that the children had been left with a heroin using relative, that M.M. had not been enrolled in school, and more. *Id.* at 8, 9-10. M.M. "was placed in foster care by the Agency," and S.C. and J.C. "were initially placed by the Agency with a paternal aunt and uncle." *Id.* at 8. On June 12, 2018, S.C. and J.C. "were placed in the same foster home as [M.M.]." *Id.* All three children "have remained together in the temporary custody of the Agency and in the foster care of Mr. and Mrs. [C.]." *Id.* at 8-9.

{¶ 7} FCCS filed complaints on August 10, 2018, requesting custody of M.M., S.C., and J.C., and alleging the children "to be neglected and dependent children." *Id.* at 9. Three days later, the juvenile court "granted temporary orders of custody" of the children to FCCS and "ordered random drug screens" of S.B. and J.H.C. *Id.* During "much of the first year" of the pending cases, J.H.C. "was incarcerated for F-5 Burglary and Theft." *Id.* at 10.

{¶ 8}  The juvenile court conducted a consolidated adjudicative hearing on October 30, 2018, and found M.M., S.C., and J.C. to be "dependent children."  *Id.* at 9.  It granted FCCS temporary custody of the three children, and adopted a case plan ("Case plan No. 2.01").  *Id.* at 10.

{¶ 9}  FCCS filed motions for permanent custody of M.M., S.C., and J.C. in April 2019.  FCCS filed second motions for permanent custody on July 23, 2020 (for M.M.) and August 3, 2020 (for S.C. and J.C.).  On January 24, 2021, J.H.C. filed a motion seeking legal custody of M.M. (apparently pursuant to his wish, as supported by S.B., albeit not by M.M.'s father B.M., to exercise custody over all three children, *see, e.g.,* Jan. 28, 2021 Tr. at 8, 9).

{¶ 10}  The permanent custody motions proceeded to hearing on January 27, 2021.  Although represented by counsel, neither S.B. nor J.H.C. appeared.  The juvenile court accommodated counsels' delay request by conducting in-camera interviews of all three children that day, while putting other matters off to the next.  During the in-camera session, each of the children expressed a desire to stay with his or her foster family.  Jan. 27, 2021 Tr. at 72, 108, 142.

{¶ 11}  To quote from S.B.'s brief: "When trial resumed the next day, the parents were still not in attendance.  Mother's attorney noted that he had last spoken with her over a month before and had been unable to contact her since then.  He also noted that mother had an active warrant from Franklin County.  Mother last told her attorney that she wished to contest the permanent custody motion and supported custody going to [J.H.C.].  [The lawyer for B.M., putative father of M.M.] indicated that he had met with B.M. and B.M. no longer contested permanent custody, but did contest  [J.H.C.'s] motion for custody of M.M. [J.H.C.'s] counsel noted that the agency did provide a ride [for his client], but it was not needed.  [He] was unwilling to explain any further because it touched on confidential communications."  Appellant's Brief at 3-4, citing Jan. 28, 2021 Tr. at 6-11.

{¶ 12}  That is an apt summary.  Counsel for S.B., in noting his client's absence, stated: "She indicated to me that she was in no position to take custody at this time." Jan. 28, 2021 Tr. at 8.  Counsel for B.M. stated that his client "is uncontested to the PCC at this time," and that "[t]he only piece he would contest if it went forward" was J.H.C.'s motion for custody of M.M.  *Id.* at 9.  Counsel for J.H.C. noting his client "is not here," stated, "our motion remains pending and we are contested to the permanent custody motion."  *Id.* at 10.

{¶ 13} The first witness for FCCS was its caseworker, Heather Dowell. Ms. Dowell recounted that on June 6, 2013, FCCS initiated a case involving the "first substantiated allegation" when S.C. was born "tox positive." *Id.* at 32. A complaint was filed, and FCCS obtained custody of the children "from 2013 until May of 2015." *Id.* at 33. The temporary court custody order lasted "18 months," and the case was "closed out June, 2016." *Id.* at 34.

{¶ 14} After FCCS opened its 2018 case as to all three children, she continued, J.C. and S.C. were placed with an aunt and uncle for "[l]ess than 30 days." *Id.* at 41. They then were moved to the same foster family with which M.M. had been placed, and all three children remain in that home. *Id.* at 43. As reflected by stipulation, "all three children have been in the continuous temporary custody of the Agency for 12 or more months prior to the filing of this second motion for permanent custody." *Id.* at 47.

{¶ 15} Ms. Dowell recited that S.B.'s case plan objectives included "Drug Court, random drug screens [and] an [alcohol and other drug ("AOD")] assessment," in addition to a requirement that she "be available for home visits." *Id.* at 52.

{¶ 16} S.B.'s contact with an earlier caseworker was "[l]imited," as "[w]e weren't able to locate her often." *Id.* at 54. She was accepted into an out-patient addiction program with "Amethyst * * * but they felt that she needed to detox first and sent her over to Maryhaven." *Id.* at 56. S.B. checked herself into the in-patient program at Maryhaven, but she did not successfully complete the program - - she remained there only "[t]wo hours." *Id.* Ms. Dowell testified that S.B. did not complete any other AOD program, and that she had not successfully completed the alcohol and drug assessment specified in her case plan. *Id.* at 57. S.B. also did not successfully complete drug screens. "She's missed over 100 screens," while completing only four; each of those four drug tests was positive for illicit drugs, and she never has provided a negative screen. *Id.* at 59, 65.

{¶ 17} S.B.'s reunification case plan included goals of stable housing and income. S.B. "has stated that she's living between two separate houses." *Id.* at 66. Ms. Dowell has attempted to contact S.B., but "[h]er voicemail is full and I'm not able to leave a message." *Id.* at 67. Ms. Dowell testified that she has received no documentation indicating that S.B. is currently on a lease or rental agreement, and S.B. has not provided documentation as to income or employment. Ms. Dowell is unaware of S.B. having a job during the time of the

case plan; S.B. "reported that she receives SSI benefits." *Id.* at 69. In Ms. Dowell's view, S.B. did not substantially complete the objectives set forth in the case plan. *Id.* at 71.

{¶ 18} For his part, J.H.C. also was to complete an alcohol and drug assessment and submit drug screens. In 2019, he completed an alcohol and drug assessment with a provider in Hillsboro, Ohio, and he enrolled in alcohol and drug treatment services through that same provider. But when Ms. Dowell spoke with J.H.C. in July 2020 regarding his progress, "[h]e stated that he * * * no longer needed the treatment and that's why he wasn't attending." *Id.* at 91. FCCS requested that J.H.C. complete orientation and screens at American Court Services, but "[h]e never completed the orientation." *Id.* at 98. J.H.C. had not enrolled in or completed any other AOD programs. *Id.* at 92, 209.

{¶ 19} Ms. Dowell, who herself has spoken with J.H.C. only one time, described J.H.C.'s contact with the previous caseworker as also "minimal." *Id.* at 103. Phone calls from Ms. Dowell to J.H.C. since June 2020, with messages requesting that J.H.C. call her back, reached only "an unidentified voicemail." *Id.* at 104. J.H.C. "reported that he lives with his mother" in Hillsboro, Ohio, and that he is employed, but he "has not provided" Ms. Dowell "with a name" or any evidence of employment or income. *Id.* at 100, 106. J.H.C. informed Ms. Dowell "he didn't want me to contact his boss." *Id.* at 107. As part of his case plan, J.H.C. was requested to resolve "his legal issues"; J.H.C. indicated he "has resolved those issues, but he is still on parole." *Id.* at 107, 116.

{¶ 20} Ms. Dowell testified, too, as to parental visitation. Before the Covid-19 pandemic with its various protocols, J.H.C. was "pretty consistent" with weekly visitations. *Id.* at 117. S.B. also was "pretty consistent" with visitations before the pandemic. *Id.* at 118. In March 2020, visitation was "taken off the schedule due to COVID shut down." *Id.* at 123. Visits were scheduled again in July 2020, but S.B. "has not attended any visits" in person from that point. *Id.* at 126. She did participate in "Facetime or Zoom or phone calls," but her contact was "inconsistent." *Id.* J.H.C. did not attend his scheduled July 2020 visit or make subsequent visits. After a "seventh missed visit," he was removed from the visitation schedule. *Id.* at 129. Added back to the visitation schedule by court order in December 2020, he failed to attend three consecutive scheduled visits and again was removed from the visitation schedule. *Id.* at 136.

{¶ 21} Ms. Dowell testified that S.B.'s last visit with the children had been in March 2020. *Id.* at 142. J.H.C.'s last visit with the children was also that month. *Id.* J.H.C. did

participate in Facetime and telephone calls with the children.  S.B. had "no contact" with the children "between July through * * * the end of October" of 2020.  *Id.* at 143.

{¶ 22}  The children refer to their foster parents as "[m]om and dad," and the foster parents provide a potential adoptive home. *Id.* at 146, 150.  Ms. Dowell testified that there is a close bond among M.M., S.C., and J.C., and that the foster parents are "extremely bonded" with the three children. *Id.* at 147. M.M. has special needs, and is "diagnosed with post-traumatic stress disorder," as well as "ADHD" for which he is prescribed medication; he also has exhibited "behavioral concerns and outbursts."  *Id.* at 151.  J.C. "is behind in school," reads "at a lower level," and receives "IEP services."  *Id.* at 153. The foster parents have special needs experience, having "adopted six other special needs children." *Id.* at 194.

{¶ 23}  Ms. Dowell believes that granting permanent custody to the agency is in "the best interest" of the children, and that neither S.B. nor J.H.C. would be "able to care for these [children] long term."  *Id.* at 155.  In making that assessment, Ms. Dowell cited "continued homelessness issues," as well as "concerns with alcohol and drug use."  *Id.*

{¶ 24}  Lawyer Mark Murphy was appointed guardian ad litem ("GAL") in both cases on May 31, 2018.  He testified to concerns about S.B. related to "the substance issues and many of the accompanying issues that go along with that."  *Id.* at 232.  S.B. "knew she needed to get help with her sobriety and she would tell me that * * * she was [going to] go into in-patient and move forward.  And then unfortunately that just never occurred," he recounted.  *Id.* at 238.

{¶ 25}  Mr. Murphy's only interactions with S.B. were at court hearings or child visitations.  "I had gone to the house a few times and she was never there, they said she'd give me a call right back [and she never did]."  *Id.* at 232.  He also "sent letters, called, never heard anything."  *Id.* at 237.

{¶ 26}  Mr. Murphy's contact with J.H.C. was "extremely inconsistent."  *Id.* at 241. During the "first year of the case [J.H.C.] was incarcerated due to the * * * burglary and theft."  *Id.*  Then, "[a]fter COVID nothing ever happened, no phone calls were responded to or a letter wasn't responded to."  *Id.*  Attempts by Mr. Murphy to contact J.H.C. at an address in Hillsboro, Ohio, were unsuccessful.

{¶ 27}  The current foster home is appropriate for the children, Mr. Murphy testified. The children "were happy," and "there's no concerns; the needs are met there, the food's there, all their basic needs are met."  *Id.* at 245.  As to the wishes of the children, Mr. Murphy

testified it "was somewhat all over the map as this case has been open 31 months." *Id.* at 246. He stated that "recently, * * * within the past * * * few months," the children indicated "we like to see * * * biological mom and dad, but we want to stay where we're at" with the foster parents. *Id.* The children "do say they want to be adopted." *Id.* at 248. The children need a legally secure permanent placement, GAL Murphy opined; currently, they "are doing so well, especially [M.M.]," for whom "the difference between May of 2018, June, 2018 to today, [is] a 180 turnaround." *Id.* at 249. The GAL emphasized that "the permanency, the stability has been absolute key for them," and that "it's instrumental for them to * * * have that moving forward." *Id.*

{¶ 28} Mr. Murphy urged granting the motion for permanent custody, saying again: "[W]e are at the point that the kids need permanency." *Id.* He further testified: "I believe we've had 16 court hearings now and [J.H.C.] appeared at one. Mother * * * probably has appeared at three or four." *Id.* at 263. Noting that "even today, there's no parents in the courtroom," GAL Murphy stated, "so much of being an adult is * * * showing up, proving that you are going to do everything that you can for these children. And I have not seen that." *Id.* at 264.

{¶ 29} In its April 5, 2021 Judgment Entry as filed in both cases, the juvenile court found, among other things, that S.B. and J.H.C. had "utterly failed to complete essential components of the reunification case plan," Judgment Entry at 13; that "[n]o other relatives ever visited with the Children" during that time and that no one other than J.H.C. had sought custody, *id.* at 14; that "the bond of the children with [J.H.C.] and Mother was likely diminished due to the lack of consistent visitation by either Parent subsequent to the resumption of allowing for weekly in-person visitations," *id.* at 15; that the children are very bonded with their foster family and want to live there, *id.*; and that the children are bonded to each other and should remain together, *id.* The juvenile court concluded that, "returning [M.M., S.C., and J.C.] to a Parent would create a significant risk to his/her health, [and that] the best option for [each of the three] to have a full life is that they be adopted as siblings, and that granting the motion for permanent custody is in their best interest." *Id.* at 16.

{¶ 30} The juvenile court granted FCCS's motions, committed M.M., S.C., and J.C. to FCCS for the purpose of adoption, and divested S.B., B.M., and J.H.C. of their parental rights. The court also denied J.H.C.'s motion for legal custody of M.M. and dismissed FCCS's first motions for permanent custody.

{¶ 31} S.B. has appealed in both cases; no one else has appealed in either.  By journal entry filed May 13, 2021, this court on its own motion consolidated the appeals for determination.

{¶ 32} S.B. mounts one assignment of error:

> Appellant's Due Process rights were violated by a grant of permanent custody that was not supported by the weight of the evidence.

{¶ 33} Under that single assignment, S.B. poses two questions. She asks: "When parents maintain a bond with their children, is it in the best interests of the children to terminate their relationship with parents?"  "Can the children be placed with mother within a reasonable time when mother made efforts to remedy the conditions causing the removal?"  Appellant's Brief at ii.

{¶ 34} When the state seeks to exercise the authority to terminate parental rights, a parent "must be afforded every procedural and substantive protection the law allows." *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991). "Where procedures have been followed in accordance with statute, '[a] trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence.' " *In re K.J.,* 10th Dist. No. 19AP-727, 2020-Ohio-4391, ¶ 17, quoting *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 13, further citation omitted.  " 'In determining whether the trial court's ruling on the permanent custody motion is against the manifest weight of the evidence, we must consider whether the evidence on each element of the agency's case satisfied or failed to satisfy the burden of persuasion, i.e., whether clear and convincing evidence supports each element.' " *K.J.* at ¶ 17, quoting *In re T.M.*, 10th Dist. No. 18AP-943, 2020-Ohio-815, ¶ 8.

{¶ 35} R.C. 2151.414 establishes "the procedure for granting permanent custody of a child to an agency such as FCCS." *In re C.W.*, 10th Dist. No. 19AP-309, 2020-Ohio-1248, ¶ 54.  Before granting permanent custody, a juvenile court "must make two determinations by clear and convincing evidence." *Id.*, citing *In re R.G.*, 10th Dist. No. 12AP-748, 2013-Ohio-914, ¶ 6. First, the court must "determine whether one of the five factors set forth in R.C. 2151.414(B)(1) applies." *Id.*

{¶ 36} Here, the juvenile court concluded that R.C. 2151.414(B)(1)(d) applied.  That subsection obtains when: "[t]he child has been in the temporary custody of one or more

public children services agencies * * * for twelve or more months of a consecutive twenty-two month period."  Specifically, the juvenile court found that M.M., S.C., and J.C. "were in the continuous custody of the Agency for purposes of R.C. 2151.414(B)(1)(d), from May 31, 2018, to the date of the July 23, 2020, and the August 3, 2020, filing of the second motions for permanent custody, a period of over 12 months."  Judgment Entry at 14.  (emphasis omitted).  S.B. does not challenge that determination.  *See* Appellant's Brief at 12 ("Mother does not contest this finding").   We note that the juvenile court additionally found applicable R.C. 2151.414(B)(1) alternative provisions (citing R.C. 2151.414(B)(1)(a) and (b)).  While disputing those alternative findings, S.B. acknowledges that only one of the enumerated circumstances in R.C. 2151.414(B)(1) must be met to satisfy the first part of the permanent custody analysis.  *See* Appellant's Brief at 13.

{¶ 37}  S.B.'s challenge to the juvenile court's decision instead implicates what we have called the second part of the statutory review, under which the juvenile court "must determine whether 'by clear and convincing evidence, * * * it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody.' "  *K.J.*, 2020-Ohio-4391, at ¶ 16, quoting R.C. 2151.414(B)(1).  Clear and convincing evidence is defined as "that degree of proof [that] will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established."  *In re W.A.,* 10th Dist. No. 06AP-485, 2006-Ohio-5750, ¶ 5, citing *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 38}  In determining the best interest of a child, a juvenile court "may apply one of two different tests."  *In re J.P.,* 10th Dist. No. 18AP-834, 2019-Ohio-1619, ¶ 39.  "Under R.C. 2151.414(D)(1), the juvenile court weighs multiple factors * * * to decide whether granting an agency permanent custody of a child is in that child's best interest."  *Id.*  By contrast, "under R.C. 2151.414(D)(2), if the juvenile court makes [each of] the four enumerated findings, permanent custody is per se in the child's best interest and the court 'shall' commit the child to the permanent custody of the agency."  *Id.*, citing *In re J.R.*, 10th Dist. No. 17AP-698, 2018-Ohio-1474, ¶ 41.  These two provisions "are alternative means for reaching the best-interest determination," and "[w]here a juvenile court employs the R.C. 2151.414(D)(1) [multiple factor weighing] method of determining the child's best interest, the court need not also conduct the R.C. 2151.414(D)(2) [four-requisite prong] analysis."  *Id.* at ¶ 40.

{¶ 39} R.C. 2151.414(D)(1) states in part:

In determining the best interest of a child at a hearing held pursuant to division (A) of this section * * * the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 40} The April 5, 2021 Judgment Entry reflects that the juvenile court considered all these statutory factors in concluding that an award of permanent custody to FCCS was in the best interest of the children.

{¶ 41} S.B. does not even attempt an argument with regard to the R.C. 2151.414(D)(1)(b), (c), (d), or (e) factors. She contends, rather, under R.C. 2151.414(D)(1)(a), that while she did not seek custody herself (urging instead that J.H.C. be given custody), she did "maintain[] a bond with the children" that should outweigh all else. *See* Appellant's Brief at 14-15 (acknowledging that the all else includes that she had "clearly failed to satisfy the case plan").

{¶ 42} We have observed that "no single best interest factor is controlling." *In re N.W.*, 10th Dist. No. 07AP-590, 2008-Ohio-297, ¶ 19. Rather, "the best interest test is a balancing test." *Id.* Moreover, the juvenile court's analysis of the first factor to be weighed (as with its analysis of the other factors) was based on what the record reflects.

{¶ 43} Considering the scope of R.C. 2151.414(D)(1)(a) and the children's relationships with their "parents, siblings, relatives, [and] foster caregivers," the juvenile court here found that the children are "very bonded with each other," they "have lived in the home of their foster parents for the last 31 months of their young lives," and they "are very bonded with their foster parents and with the six adopted children of the foster parents." Judgment Entry at 15. The juvenile court further noted that the foster parents "are a potential adoptive home for [M.M., S.C., and J.C.]." *Id.* According to the testimony of the FCCS caseworker, relied upon by the juvenile court, "[t]here is a bond between" M.M., S.C., and J.C., Jan. 28, 2021 Tr. at 146, and the foster parents are "extremely bonded with all three" of the children, *id.* at 147. The juvenile court also assessed the relationships of the children with S.B. and J.H.C.

{¶ 44} " 'Courts have considered the consistency of a party's visitation with a child when resolving the R.C. 2151.414(D)(1)(a) factor.' " *In re M.W.*, 10th Dist. No. 19AP-769, 2020-Ohio-5199, ¶ 21, quoting *In re K.R.,* 10th Dist. No. 18AP-633, 2019-Ohio-2192, ¶ 82. Here, caseworker Ms. Dowell testified that while "[p]rior to Covid" S.B.'s visitation was "pretty consistent," Jan. 28, 2021 Tr. at 118, after visitations were suspended in March 2020 and allowed to resume in July 2020, "[s]he has not attended any visits," *id.* at 126; S.B.'s last in-person visitation with the children thus was in March 2020, *id.* at 142. Her participation in Facetime and/or Zoom calls during this time "was inconsistent." *Id.* at 126. Meanwhile, J.H.C. was removed from the visitation schedule for having skipped his scheduled visits from July 2020 on. The trial court was justified in finding that, while the children were happy to see J.H.C. and S.B. at visitations before Covid, the bond of the children with both J.H.C. and S.B. "was likely diminished due to the lack of consistent visitation by either Parent subsequent to the resumption of allowing for weekly in-person visitations." Judgment Entry at 15.

{¶ 45} Turning to R.C. 2151.414(D)(1)(b), under which a juvenile court is required to consider the "wishes of the child," the juvenile court found that: "Since October of 2020," all three of the children "have consistently stated they each want to live with their foster parents," and each child "independently" stated his or her desire to be adopted (a concept the juvenile court found they understood). Judgment Entry at 15. Again, those findings are in accord with the record. During the in-camera interviews of the children, M.M. stated: "I want to get adopted" by the foster parents. Jan. 27, 2021 Tr. at 72. M.M., who described

his foster mother as "kind," stated that she "takes care of me" and "gives me a roof over my head, she feeds me." *Id.* at 83. S.C., during her in-camera interview, similarly described her foster mother as "[k]ind," and stated her desire to live with her foster parents. *Id.* at 105. During the in-camera interview of J.C., the youngest child, he expressed a desire to "[s]tay where I am," at his foster home, and to be "[a]dopted." *Id.* at 142.

**{¶ 46}** In addressing this factor, the juvenile court also cited the GAL's recommendation that "the motions for permanent custody be granted," as well as testimony by the GAL that the children "should remain together and be adopted by the same family." Judgment Entry at 15. GAL Murphy's recommendation came "in part because: 'Parents need to show up and do what is needed.' " *Id.* The court further cited testimony by the GAL indicating that, of approximately "16 court hearings, [J.H.C.] appeared for 1 hearing and Mother appeared for 3 or 4 hearings." *Id.* There existed "no conflict" between the recommendation of the GAL "and the wishes of the Children." *Id.* at 7. The juvenile court's findings as to the best wishes of the children are fully consistent with the record, including Mr. Murphy's testimony, and are not contested by S.B.

**{¶ 47}** R.C. 2151.414(D)(1)(c) requires the court to consider the "custodial history of the child." In discussing this factor, the juvenile court noted that M.M., S.C., and J.C. "are now age 11, 7, and 6 respectively," that they "have been in the Agency's temporary custody since May 31, 2018, a period of over 31 months," and that M.M. and S.C. "had previously spent over 18 months in the Agency's temporary custody." Judgment Entry at 16. S.B. makes no argument regarding this factor.

**{¶ 48}** R.C. 2151.414(D)(1)(d) addresses a child's need for a "legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." The juvenile court did consider the needs of the children and also cited testimony of the caseworker that the children "should not be separated." Judgment Entry at 16. The record as a whole, including evidence that M.M. had made significant progress while living with the foster parents and evidence that neither S.B. nor J.H.C. is equipped to provide the children what they need, substantiates the juvenile court's determinations on this score. Again, S.B. makes no argument with regard to this statutory factor.

**{¶ 49}** With regard to R.C. 2151.414(D)(1)(e), the juvenile court stated that "[n]o evidence was offered as to the best interest factors listed in divisions (E)(7) to (11) of R.C.

2151.414."  Judgment Entry at 16.  S.B. does not challenge the juvenile court's finding on that issue either.

{¶ 50}  The record demonstrates that the juvenile court reviewed and weighed the evidence as to the relevant factors under R.C. 2151.414(D)(1), and we find no error in the court's weighing of the evidence in reaching its best-interest determination.  The juvenile court's ultimate conclusion, by clear and convincing evidence, that it was in the best interest of the children that the agency be awarded permanent custody was not against the manifest weight of the evidence.

{¶ 51}  In addition to finding that permanent custody was in the best interest of the children under R.C. 2151.414(D)(1), the juvenile court made a further finding that "all four of the circumstances set forth in R.C. 2151.414(D)(2) were proven by clear and convincing evidence" (thus mandating the grant of permanent custody also made pursuant to the (D)(1) weighing analysis).  Judgment Entry at 16.  Because R.C. 2151.414(D)(1) and (2) "are alternative means for reaching the best-interest determination," *J.P.*, 2019-Ohio-1619 at ¶ 40, our conclusion that the juvenile court did not err in its permanent custody determination pursuant to R.C. 2151.414(D)(1) obviates any significance to S.B.'s argument regarding application of R.C. 2151.414(D)(2).  *Compare In re N.M.*, 10th Dist. No. 20AP-158, 2021-Ohio-2080, ¶ 63 (noting that, although it was not necessary for trial court to conduct analysis under R.C. 2151.414(D)(2) after having already determined permanent custody was in the child's best interest, pursuant to R.C. 2151.414(D)(1), the "alternative findings" made by the court "also" supported granting the agency's motion for permanent custody).

{¶ 52}  Moreover, were we to assess the juvenile court's R.C. 2151.414(D)(2) determination, we would conclude that the record supports the juvenile court's finding by clear and convincing evidence that the children could not be placed with either parent within a reasonable time and should not be placed with either parent pursuant to R.C. 2151.414(E)(1) (addressing whether the parent has failed to "substantially remedy" the conditions that caused the removal of the child).  S.B.'s "acknowledge[ment] that she needed further treatment" of her drug problem may have been "a big step toward recovery" as she urges.  Appellant's Brief at 16.  But—especially in light of her subsequent refusal of that treatment, as evidenced by her abandonment of the Maryhaven program after a mere two hours, coupled with her inability then to provide any clean drug screen over a very

sustained period of time—in no way does that "acknowledge[ment]" mark her on this record as "a viable placement for the children within a reasonable period of time." *Compare id.*

**{¶ 53}** And S.B.'s view that the juvenile court misstated the content of an alternative finding under R.C. 2151.414(E)(4) is superfluous given that court's amply justified finding under that (E)(1) subsection. *See* R.C. 2151.414(D)(2)(a) (requiring "*one* or more of the factors in Division (E) of this section") (emphasis added).

**{¶ 54}** S.B. mounts no other arguments against the juvenile court's (D)(2) analysis. On this record, R.C. 2151.414(D)(2) would provide an alternate basis for the permanent custody order.

**{¶ 55}** We overrule S.B.'s single assignment of error, and we therefore affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

SADLER and JAMISON, JJ., concur.

NELSON, J., retired, of the Tenth Appellate District, assigned to active duty under the authority of the Ohio Constitution, Article IV, Section 6(C).

_____